Winston **MOSELEY**, Petitioner,

v.

Charles J. **SCULLY**, Superintendent, **Greenhaven Correctional Facility,** Respondent.

No. 90–CV–1048.

United States District Court, E.D. New York.

Nov. 10, 1995.

---

Barry Gene Rhodes, Brooklyn, NY, for petitioner.

Richard A. Brown, Queens County District Attorney by Steven J. Chananie, Robin A. Forshaw, and John M. Castellano, Assistant District Attorneys Kew Gardens, NY, for respondent.

### MEMORANDUM AND ORDER

BLOCK, District Judge:

This case involves one of the most infamous and brutal murders committed this century, which shocked the nation when it was committed in 1964, and continues to trouble the public today. As recently reported by the *New York Law Journal*, the 1964 murder of Katherine "Kitty" Genovese ("Genovese") in Queens, New York "symbolized urban apathy [since] 38 people heard her screams but did nothing." N.Y.L.J., July 25, 1995, at 1, col. 1. This Court is now called upon to decide whether it should grant the plea for freedom requested almost 25 years later by Genovese's confessed murderer, Winston Moseley ("Moseley"), pursuant to

his petition for a writ of *habeas corpus* under 28 U.S.C. § 2254.

The focus of this proceeding is on a disclosure made during the sentencing phase of Moseley's trial by his lead lawyer, Sidney Sparrow, Esq. ("Sparrow"), that he had previously represented Genovese, and his rather startling admission that, as a result, he "didn't try this case ... objectively, calmly, just as a lawyer defending a client [should]." Record on Appeal to New York Court of Appeals ("Record") at 484–85. This disclosure and admission compelled the Court to conduct a hearing on July 24, 1995 to inquire into the nature, duration, breadth and bounds of this prior representation for the purpose of determining whether Sparrow labored under a Constitutionally impermissible conflict of interest that adversely affected his representation.[1] The Court addresses this issue, which it decides against Moseley, only after determining that neither the passage of time nor other procedural grounds bar Moseley's claim, and that the "automatic reversal rule," applicable to a trial court's failure to inquire into a possible conflict, post-dates both the time Moseley's trial concluded in June 1964 and his conviction became final in June 1967.

## I.

### FACTS AND PROCEDURAL BACKGROUND

#### A. *The Confessed Murder*

At his trial, Moseley took the stand in support of an insanity defense and confessed to killing Genovese. According to his testimony, he left his house in the early morning hours of Friday the 13th, March 1964, with a hunting knife for the purpose of "finding a woman and killing her." Record at 233. At approximately 3:00 a.m., he spotted a red car, driven by Genovese, which he followed for approximately ten blocks. *Id.* at 235. Both Genovese and Moseley got out of their respective cars, and upon seeing Moseley, Ge-

novese started to run. *Id.* at 236. Moseley caught her and, as he stated, "stabbed her twice in the back." *Id.* Because someone had called out from an open window, Moseley returned to his car and moved it, but he "could see that [Genovese] had gotten up and that she wasn't dead." *Id.* Since he "did not think that the person that called would come down to help [Genovese] regardless [of] the fact that she had screamed, [he] came back and ... look[ed for her] in[ ] the Long Island [R]ailroad station." *Id.* Not finding her there, Moseley looked in some nearby apartment buildings, where he found her in a hallway. *Id.* As he testified: "As soon as she saw me, she started screaming[,] so I stabbed her a few other times to stop her from screaming, and I had stabbed her once in the neck.... [S]he only moaned after that." *Id.*

During the commission of this brutal attack, Moseley could hear that he had awakened residents of the apartment building. He heard a door open "at least twice, maybe three times, but when [he] looked up ...," there was nobody up there." *Id.* at 238. Since he "didn't feel that these people were coming down the stairs anyway," *id.*, he decided to rape Genovese. He removed her undergarments and, upon discovering that she was menstruating, took "the knife and st[u]ck it in her vaginal tract." *Id.* at 239. He said that he "would have pulled the knife straight up, but the bone [had] stopped [him] from being able to do that." *Id.* Thereafter, Moseley attempted to rape her, but could not because of impotence. *Id.* He nevertheless had an orgasm. *Id.* After stealing her wallet, keys and some cosmetics, Moseley left Genovese dead. *Id.*

#### B. *Arrest Through Appeal*

Five days later, when Moseley was arrested for an unrelated burglary, he confessed to all of the above and also to murdering two other women, raping a third, attempting to rape yet another, and numerous burglaries. Moseley was indicted on March 23, 1964 for

1. The Court held this hearing pursuant to the Second Circuit's directive in *Strouse v. Leonardo*, 928 F.2d 548 (2d Cir.1991): "Where a petitioner alleges facts that, if proven, would entitle him to relief, a federal court 'must hold an evidentiary hearing if the *habeas* applicant did not receive a full and fair evidentiary hearing in a state court.'" *Id.* at 554 (quoting *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963)).

first-degree murder under former N.Y.Penal Law § 1045 for killing Genovese. Two days later, Justice J. Irwin Shapiro assigned Sparrow as lead counsel to represent Moseley at trial, along with two co-counsel, Julius Lipitz, Esq. ("Lipitz") and Martha Zelman, Esq.

Given Moseley's confession, the strategy at trial, which commenced on June 8, 1964, was to rely on the insanity defense. In addition to his testimony admitting killing Genovese, Moseley also repeated his confessions to the other murders, the rape, the attempted rape, and the burglaries. He expressed no regret or sorrow. Two noted psychiatrists testified for the defense, opining that Moseley could not distinguish right from wrong. Sparrow cross-examined the prosecution's psychiatrist on the ground that he had not personally examined Moseley. Ultimately, however, the jury rejected the insanity defense and rendered a guilty verdict.

On June 15, 1964, pursuant to former N.Y.Penal Law § 1045-a, a separate sentencing proceeding commenced before the same jury to determine whether the trial court should impose the death penalty. *See People v. Moseley*, 20 N.Y.2d 64, 66, 228 N.E.2d 765, 766, 281 N.Y.S.2d 762, 764 (1967). In his final argument to the jury, Sparrow told the jury (in Moseley's presence): "I didn't try this case involving Kitty Genovese objectively, calmly, just as a lawyer defending a client, because I knew Kitty Genovese, and represented her for years." Record at 484–85. Justice Shapiro immediately interrupted Sparrow and forbade him from continuing with this argument, stating that "[w]e don't know anything about that; that's not in the record," *id.* at 485, whereupon Sparrow concluded without further comment on the issue.

On July 6, 1964, after the jury recommended that the court sentence Moseley to death, Justice Shapiro imposed that sentence. *Moseley*, 20 N.Y.2d at 66, 228 N.E.2d at 766, 281 N.Y.S.2d at 764. Sparrow moved to set aside the conviction and sentence, which motion was denied. Thereafter, Spar-

row appealed directly to the New York State Court of Appeals pursuant to former N.Y.Crim.Proc.Law § 517(1). On June 1, 1967, the Court of Appeals affirmed the conviction, but set aside the sentence because the trial court had barred Sparrow from recalling two psychiatrists to testify on Moseley's behalf during the sentencing phase. 20 N.Y.2d at 70, 228 N.E.2d at 768, 281 N.Y.S.2d at 767. On remand, Moseley was sentenced to life imprisonment, in conformity with the Court of Appeals' directive.[2] *Id.; see also* former N.Y.Penal Law § 1045-a(6) (requiring automatic sentence of life imprisonment where the Court of Appeals remands after finding substantial error in the sentencing proceeding).

## C. *Post–Appeal Proceedings*

On February 1, 1989, Moseley, proceeding *pro se*, moved under N.Y.Crim.Proc.Law § 440.10 to set aside his conviction on the ground that Sparrow's prior representation of Genovese created an actual conflict of interest that violated his Sixth Amendment right to effective assistance of counsel. This marked the first time Moseley raised this ineffective assistance of counsel claim. Moseley submitted with his § 440.10 motion a letter sent to him by a newspaper columnist at *Newsday* in which the columnist discussed Sparrow's prior representation of Genovese and the possibility of challenging the conviction on that ground. The letter was dated May 23, 1979, nearly ten years prior to his motion.

On May 1, 1989, Justice Charles J. Thomas of the New York State Supreme Court denied Moseley's motion. Decision Denying N.Y.Crim.Proc.Law § 440.10 Motion (Apr. 28, 1989) ("Thomas Decision"). Justice Thomas based his decision on three grounds. First, he held that Moseley had failed to establish that Sparrow rendered Constitutionally infirm assistance because there existed no evidence that Sparrow "actively repre-

---

2. In 1968, Moseley escaped from jail while serving his life sentence. The police arrested him shortly after his escape and charged him with committing robbery, kidnapping and another rape. Affirmation Of John Castellano In Opposition To *Habeas Corpus* Petition ¶ 18 (Apr. 16,

1990). Moseley was ultimately convicted of robbery in the second degree and attempted kidnapping in the second degree, and sentenced to serve a term of imprisonment to run concurrently with his life-imprisonment sentence. *Id.*

**1126**

sented conflicting interests" (or that there was a "significant possibility" of such a conflict), or that any "such conflict actually resulted in diminished representation." *Id.* at 2–4. Second, Justice Thomas held that state procedural rules barred granting Moseley's motion because Moseley had failed to raise the conflict of interest issue on direct appeal to the Court of Appeals, even though there existed sufficient evidence in the record for doing so. *Id.* at 4–5. Finally, Justice Thomas concluded that Moseley's delay in bringing the motion cast doubt on the validity of his claim because Moseley knew of Sparrow's purported conflict prior to sentencing, or at least when the *Newsday* columnist informed Moseley of it. *Id.* at 5–6. On March 30, 1990, Moseley filed this *habeas* petition.

## II.

### DISCUSSION

Moseley again claims that Sparrow's prior representation of Genovese created a Constitutionally impermissible conflict of interest resulting in ineffective assistance. He also argues that the trial court's failure to conduct an inquiry regarding this purported conflict mandates automatic reversal of his conviction. Respondent, on the other hand, argues that Moseley is barred on procedural grounds from raising these claims in federal court. Respondent also argues that, if the Court determines that Moseley is not so barred, he has failed to establish that Sparrow rendered Constitutionally infirm assistance or that the trial court erred in failing to conduct a conflict inquiry. For the reasons that follow, the Court holds that Moseley is not barred on procedural grounds from raising his claims in this tribunal, but concludes, after carefully considering all of the evidence adduced at the hearing, reviewing the record of the state court proceedings and analyzing applicable caselaw, that he has failed to establish entitlement to *habeas* relief.

### A. *Moseley's Claims Are Not Barred On Procedural Grounds*

Respondent erects two procedural barriers which he argues preclude review of Moseley's claims in this court. First, he argues

that because Justice Thomas' decision denying Moseley's post-judgment motion rested in part on a state procedural rule—the barring of review by post-judgment motion of claims that could have been raised on direct appeal—the adequate and independent state ground doctrine mandates that this Court defer to and accept as conclusive Justice Thomas' ruling. Second, respondent argues that Moseley's unjustified delay in bringing this petition has prejudiced respondent, requiring dismissal pursuant to Rule 9(a) of the Rules Governing § 2254 Proceedings. 28 U.S.C. § 2254 (1994).

### 1. *Justice Thomas' Decision Does Not Bar Review In This Court*

In denying Moseley's motion to vacate his conviction, Justice Thomas relied in part on N.Y.Crim.Proc.Law § 440.10(2)(c) for the proposition that claims forsaken on direct appeal cannot be resurrected in a post-judgment 440.10 motion. Section 440.10(2)(c) provides in pertinent part:

[T]he court *must* deny a motion to vacate a judgment when … [, a]lthough sufficient facts appear on the record … to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's … *unjustified* failure to raise such ground or issue upon an appeal actually perfected by him.

*Id.* (emphasis added). Justice Thomas concluded that because "[t]he record reveals sufficient facts to have allowed the defendant to raise this issue on appeal and for the Court of Appeals to review and evaluate how the defense was conducted in light of counsel's prior representation of the victim," he was bound to dismiss Moseley's motion to vacate. Thomas Decision at 4–5.

 Respondent asserts that because Justice Thomas "expressly invoked [§ 440.10(2)(c) as] a procedural bar to [Moseley's] ineffective assistance of counsel claim …, this holding constitute[s] an independent and adequate state procedural ground sup-

porting the state court's determination." [3] The adequate and independent state ground doctrine, as articulated by the Supreme Court in *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), provides that a federal *habeas corpus* court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Id.* at 729, 111 S.Ct. at 2553. Claims barred under this doctrine can be reviewed only if the petitioner establishes cause for the default and resulting prejudice, *see Bossett v. Walker,* 41 F.3d 825 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995), or if the failure to review would result in a fundamental miscarriage of justice. *Murray v. Carrier,* 477 U.S. 478, 495, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986).

Although courts frequently struggle with the question of whether a state court decision is "independent of the federal claim," *Coleman,* 501 U.S. at 732, 111 S.Ct. at 2555, the issue squarely presented here is whether Justice Thomas' reliance on § 440.10(2)(c) as a bar is "adequate" to support his decision. In examining this issue, the Second Circuit's opinion in *Billy–Eko v. United States,* 8 F.3d 111 (2d Cir.1993), is instructive. In *Billy–Eko,* the Second Circuit established rules for determining whether a federal *habeas corpus* petitioner—a petitioner seeking *habeas corpus* review under 28 U.S.C. § 2255 for a conviction in federal court, rather than the *habeas corpus* review sought by Moseley under 28 U.S.C. § 2254 for his state court conviction—is procedurally barred due to the failure to raise an ineffective assistance of counsel claim on direct appeal. The court held that a petitioner is not barred where represented by the same counsel on appeal as at trial or evidence concerning the ineffectiveness claim exists outside of the trial rec-

ord. 8 F.3d at 114–15; *see also Ciak v. United States,* 59 F.3d 296, 303 (2d Cir.1995) ("[I]n *Billy–Eko* we held that the procedural default rules ... do not apply to ineffective assistance of counsel claims where a petitioner was represented by the same attorney at trial and on direct appeal or where such claims depend on 'matters outside of the record on direct appeal' "). The *Billy–Eko* court based its decision on common-sense notions:

> In many instances, an accused will be represented by the *same* counsel at trial and during direct appeal. In such cases, it would be unrealistic to expect that trial counsel would be eager to pursue an ineffective assistance claim. Moreover, even the scrupulous attorney searching the record in good faith would likely be blind to his derelictions at the trial level.
>
> ....
>
> [In addition, i]neffective assistance claims are often based on assertions that trial counsel made errors of omission, errors that are difficult to perceive from the record: for example, neglecting to call certain witnesses or introduce certain evidence. *The claims might also be based on a conflict of interest not apparent at trial....* Even if a new attorney represents the accused on direct appeal, she might not come across reasons to suspect ineffective assistance in preparing a direct appeal.

8 F.3d at 114 (emphasis added; citations omitted). *Cf. Wood v. Georgia,* 450 U.S. 261, 265 n. 5, 101 S.Ct. 1097, 1100 n. 5, 67 L.Ed.2d 220 (1981) ("The party who argued the appeal and prepared the petition for *certiorari* was the lawyer on whom the conflict-of-interest charge focused. It is unlikely that he would concede that he had continued improperly to act as counsel").

Hence, if Moseley was convicted in federal rather than state court, he clearly would not

---

**3.** Moseley actually presented his ineffective assistance claim to the Appellate Division in a leave application appealing Justice Thomas' decision, but because that court denied leave without comment, this Court looks through that decision to the last "explained state-court" decision on the issue—Justice Thomas' decision. *Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (federal *habeas* court should

look to last state court decision adjudicating an issue where highest state court to which the claim was presented did not "explain" its reasoning). *See, e.g., Levine v. Commissioner of Correctional Servs.,* 44 F.3d 121, 126 (2d Cir.1995) (order of a state appellate court denying leave to appeal without comment not the relevant state court decision to scrutinize for reliance on state procedural grounds).

be barred from pursuing his ineffective assistance claim on collateral review, since Sparrow represented him both at trial and on appeal. The question remains, however, whether his conviction in state court should render a different result.

■ Logic dictates that no different result should occur. Nevertheless, because the adequate and independent state ground doctrine "is grounded in concerns of comity and federalism," *Coleman,* 501 U.S. at 730, 111 S.Ct. at 2554, federal courts give great deference to state court decisions. As a result, federal courts will find as "adequate" the application of a particular state's procedural rule "[u]nless the procedural rule is [not] 'strictly or regularly followed.'" *Wedra v. Lefevre,* 988 F.2d 334, 339–40 (2d Cir.1993) (quoting *Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988)); *see also Amos v. Scott,* 61 F.3d 333, 339 (5th Cir.1995) ("[T]he test for the adequacy of a [state procedural] rule is that it is strictly or regularly followed by the cognizant state court") (citing *Johnson,* 486 U.S. at 587, 108 S.Ct. at 1987; *Dugger v. Adams,* 489 U.S. 401, 410 n. 6, 109 S.Ct. 1211, 1217–18, n. 6, 103 L.Ed.2d 435 (1989); *Hathorn v. Lovorn,* 457 U.S. 255, 263, 102 S.Ct. 2421, 2426–27, 72 L.Ed.2d 824 (1982)); *Oxford v. Delo,* 59 F.3d 741, 744 (8th Cir. 1995) ("Federal review is not barred where a state procedural rule is inconsistently enforced or the state court undertakes a novel application of the rule"); *Upshaw v. Singletary,* 54 F.3d 718, 720–21 (11th Cir.1995) ("In order to be 'adequate,' the rule must not have been applied by the state court in an inconsistent or manifestly unfair manner"); *Maes v. Thomas,* 46 F.3d 979, 985–86 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct.

1972, 131 L.Ed.2d 861 (1995); *Roberts v. Scully,* 875 F.Supp. 182, 193 (S.D.N.Y.1995).

■ Here, the rule imposed by Justice Thomas barring Moseley's conflict claim because he failed to raise the issue on direct appeal has not been "strictly or regularly followed" in New York State's courts where the defendant had the same trial and appellate counsel. Indeed, in *People v. Harris,* 109 A.D.2d 351, 491 N.Y.S.2d 678 (2d Dep't 1985), *appeal denied,* 66 N.Y.2d 919, 489 N.E.2d 779, 498 N.Y.S.2d 1034 (1985), the Appellate Division held, in the alternative, that section 440.10(2)(c) should *not* be invoked as a bar to collateral relief under such circumstances because "[i]t hardly seems that trial counsel would have argued his alleged ineffectiveness before this court." 109 A.D.2d at 360 n. 3, 491 N.Y.S.2d at 687 n. 3. Based upon this decision, and the common sense rationale underlying *Billy–Eko,* the Court concludes that Moseley was justified in not raising his ineffective assistance of trial counsel claim on direct appeal. *See* N.Y.Crim.Proc.Law § 440.10(2)(c) (requiring the state court to find that failure to raise claims on direct appeal "unjustified" before denying motion to vacate). Accordingly, the Court holds that Justice Thomas' decision is no bar to adjudicating Moseley's claim on its merits.[4]

### 2. Moseley's Inordinate Delay In Seeking Habeas Relief Does Not Bar His Claims

■ Moseley's quarter-century delay in bringing his *habeas* petition poignantly supports those who would argue that Congress should establish a *habeas* statute of limitations. Nevertheless, "despite many attempts in recent years," *Vasquez v. Hillery,* 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598

4. The Court notes that even if Moseley had different counsel on appeal, Justice Thomas' decision would still not bar review here. Justice Thomas' conclusion that there exists ample evidence in the record for the Appellate Division to determine whether Sparrow labored under a Constitutionally impermissible conflict is erroneous. As both the courts in *Billy–Eko* and *Harris* recognized, claims of ineffective assistance of trial counsel—particularly conflict of interest claims—do not typically lend themselves to resolution

from the trial record. *Billy–Eko,* 8 F.3d at 114 ("resolution of such claims often requires consideration of matters outside the record on direct appeal"); *Harris,* 109 A.D.2d at 360, 491 N.Y.S.2d at 687 ("The Court of Appeals has time and time again advised that ineffective assistance of counsel is generally not demonstrable on the main record"). It is precisely this reason that necessitated the hearing conducted by this Court in July 1995.

(1986), including currently pending bills,[5] Congress has yet to do so. *Brecht v. Abrahamson,* 507 U.S. 619, ——, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993) ("[T]here is no statute of limitations governing federal *habeas* ").

Indeed, courts have on occasion opined that any such limitation may violate the Constitution, wherein the framers provided that "[t]he privilege of the Writ of *Habeas Corpus* shall not be suspended, unless when in Cases of Rebellion or Invasion the Public Safety may require it." U.S. Const. art. I, § 9, cl. 2.[6] *See Strahan v. Blackburn,* 750 F.2d 438, 441 (5th Cir.) ("[A] statute of limitation[ ] arguably [may be] prohibited by the Constitution"), *cert. denied,* 471 U.S. 1138, 105 S.Ct. 2683, 86 L.Ed.2d 700 (1985); *Davis v. Adult Parole Auth.,* 610 F.2d 410, 413 (6th Cir. 1979) ("Our review of pertinent Supreme Court decisions and other authorities persuades us that a [statute of limitations] rule which would permit a court to dismiss an action for *habeas* relief without any consideration of the equities presented renders the *habeas corpus* process inadequate to test the legality of a person's conviction and, thereby, constitutes a prohibited suspension of the writ").

Nevertheless, because "[o]riginally th[e] writ was granted only when the criminal trial court had been without jurisdiction," *Rose v. Mitchell,* 443 U.S. 545, 580, 99 S.Ct. 2993, 3012, 61 L.Ed.2d 739 (1979) (Powell, J., concurring), scholars, including former Second Circuit Judge Henry J. Friendly, have argued that "[i]t can scarcely be doubted" that the Constitution protects only this limited writ "as known to the framers" and not the current writ "as Congress may have chosen to expand it, or more pertinently, as the Supreme Court has interpreted what Congress did." Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U.Chi.L.Rev. 142, 151, 170 (1970).[7] Thus, argues Judge Friendly, "[w]hat Congress has given, Congress can partially take away," *id.* at 171, providing in his view the basis to bar all *habeas corpus* claims that do not challenge a court's jurisdiction. Judge Friendly, however, would not preclude *habeas* claims raising "a colorable claim of innocence." *Id.* at 142.

Although Congress has not yet adopted a *habeas corpus* statute of limitations, it has enacted Rule 9(a) of the Rules Governing § 2254 Proceedings in United States District Courts to address the problems of unreason-

---

**5.** *See* Comprehensive Terrorism Prevention Act of 1995, S. 735, 104th Cong., 1st Sess. §§ 601–08 (1995); *Habeas Corpus* Revision Act of 1994, H.R. 4018, 103rd Cong., 2d Sess. (1994).

**6.** The writ of *habeas corpus* has its roots in English common law. The Statute of Westminster, ca. 14th century, guaranteed "[t]hat no man of what estate or condition he be, shall be put out of his lands or tenements, nor taken nor imprisoned, nor disinherited, nor put to death, without being brought to answer by due process of law." By the seventeenth century, however, the writ of *habeas corpus,* by which such rights had been enforced, had proved ineffective due to the absolute and arbitrary authority exercised in both the Court of Star Chamber and the Court of High Commission. Thomas M. Cooley, CONSTITUTIONAL LIMITATIONS 343 (The Legal Classics Library 1987) (1868). Passage of the *Habeas Corpus* Act of 1679 restored the writ to its former stature. While this act did not, by its terms, apply to the American colonies, the colonies nevertheless adopted it either expressly or by acquiescence. Congress provided for federal *habeas corpus* review in the Judiciary Act of 1789, Ch. 20, § 14, 1 Stat. 81, and the *Habeas Corpus* Act of 1867, Ch. 28, § 1, 14 Stat. 385, now 28 U.S.C. §§ 2241–55.

For a more detailed discussion of the history of the writ, *see Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (Powell, J., concurring); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (Powell, J., concurring); *Hunt v. Tucker,* 875 F.Supp. 1487 (N.D.Ala.1995).

**7.** In 1963, the Supreme Court held that "[a]t the time the privilege of the writ was written into the Federal Constitution it was settled that the writ lay to test any restraint contrary to fundamental law, which in England stemmed ultimately from Magna Charta but in this country was embodied in the written Constitution." *Fay v. Noia,* 372 U.S. 391, 426, 83 S.Ct. 822, 842, 9 L.Ed.2d 837 (1963). Subsequently, however, the Court held that "recent scholarship has cast grave doubt on *Fay's* version of the writ's historic function." *Schneckloth v. Bustamonte,* 412 U.S. 218, 253, 93 S.Ct. 2041, 2061, 36 L.Ed.2d 854 (1973) (Powell, J., concurring). Indeed, Judge Friendly bluntly wrote that "the assertion [in *Fay*] that *habeas* as known at common law permitted going behind a conviction by a court of general jurisdiction is simply wrong. The very historians cited in the opinion disagree with any such conclusion." Friendly, *supra,* at 171.

ably delayed petitions. As amended, it provides:

> A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred.

As originally proposed, Rule 9(a) created a rebuttable presumption of prejudice in favor of the state for all petitions filed more than five years after the judgment of conviction. The House Judiciary Committee, however, removed this language from the bill, stating that "[t]he Committee believes that it is unsound policy to require the defendant to overcome a presumption of prejudice. . . ." H.R.Rep. No. 1471, 94th Cong., 2d Sess. 5, *reprinted in* 1976 U.S.C.C.A.N. 2478, 2481. In a footnote, the Committee elaborated on its rationale for this modification:

> Those facts which make it difficult for the State to respond to an old claim . . . can be readily discovered by the State. It is not easy, perhaps in some instances not possible, for a prisoner to discover those facts that he would have to show to rebut the presumption of prejudice.

*Id.* at n. 8.[8]

▮▮▮ Rule 9(a) thus applies the equitable doctrine of laches to *habeas corpus* jurisprudence. 28 U.S.C. § 2254 note (1994); *Jessup v. United States Parole Com'n,* 889 F.2d 831, 834 (9th Cir.1989); *Thomas v. Dugger,* 846 F.2d 669, 671 (11th Cir.1988), *cert. denied,* 493 U.S. 921, 110 S.Ct. 285, 107 L.Ed.2d 265

(1989); *Strahan v. Blackburn,* 750 F.2d 438, 440 (5th Cir.), *cert. denied,* 471 U.S. 1138, 105 S.Ct. 2683, 86 L.Ed.2d 700 (1985); *Theriot v. Senkowski,* 802 F.Supp. 1081, 1084 (S.D.N.Y. 1992). Accordingly, "delay alone is no bar to federal *habeas* relief." *Strahan,* 750 F.2d at 443. Rather, the burden is on the State to make a "particularized showing of prejudice," *id.,* and demonstrate that such prejudice resulted from the petitioner's delay. *Id. See Thomas,* 846 F.2d at 671; *Jessup,* 889 F.2d at 834; *Honeycutt v. Ward,* 612 F.2d 36, 41 (2d Cir.1979), *cert. denied,* 446 U.S. 985, 100 S.Ct. 2969, 64 L.Ed.2d 843 (1980). Significantly, this claim of prejudice applies *only* to the inability to defend the *habeas corpus* petition, not to the difficulty of retrying the petitioner. *Vasquez,* 474 U.S. at 265, 106 S.Ct. at 624 ("Congress has not seen fit . . . to provide the State with an additional defense to *habeas corpus* petitions based on the difficulties that it will face if forced to retry the defendant"). If the state does establish prejudice resulting from the petitioner's delay, the burden shifts to the petitioner to either successfully refute the state's assertion of prejudice or show that the delayed petition is "based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred." [9] Rule 9(a), 28 U.S.C. § 2254. *See also Thomas,* 846 F.2d at 671; *Davis v. Dugger,* 829 F.2d 1513, 1519 (11th Cir.), *reh'g denied,* 834 F.2d 1028 (11th Cir.1987); *Strahan,* 750 F.2d at 441.

Respondent argues that the following facts prejudice the State: (1) the death on April 28, 1968 of Frank Cacciatore, Esq. ("Cacciatore"), the trial prosecutor; (2) the death on

---

8. Despite the deletion of the presumption of prejudice from the final version of Rule 9(a), the Advisory Committee Note to the Rule, 28 U.S.C. § 2254 note, retains the provision—in error. *Waterhouse v. Rodriguez,* 1989 WL 18736 at *2 n. 1 (E.D.N.Y. Feb. 21, 1989) (Glasser, J.), *aff'd,* 883 F.2d 1022 (2d Cir.), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 564, 107 L.Ed.2d 558 (1989) (citing *LaLande v. Spalding,* 651 F.2d 643 (9th Cir.) ("That statement [in the Advisory Committee note] . . . is in error"), *cert. denied,* 452 U.S. 965, 101 S.Ct. 3119, 69 L.Ed.2d 978 (1981)).

9. The Advisory Committee Note explaining this provision states:

> The petitioner is held to a standard of reasonable diligence. Any inference or presumption arising by reason of failure to attack collaterally a conviction may be disregarded where (1) there has been a change of law or fact (new evidence) or (2) where the court, in the interest of justice, feels that the collateral attack should be entertained and the prisoner makes a proper showing as to why he has not asserted a particular ground for relief.

Rule 9(a), 28 U.S.C. § 2254 note (1994). *See Honeycutt,* 612 F.2d at 40.

December 2, 1992 of Frank O'Connor, Esq. ("O'Connor"), the district attorney at the time of Moseley's trial; (3) the inability to locate (and probable destruction of) court records relating to Genovese's gambling conviction; (4) the inability to locate Lipitz, Sparrow's co-counsel at Moseley's trial; and (5) the death of Justice Shapiro. In light of the Court's denial of the *habeas* petition, however, the issue of prejudice to the State under Rule 9(a) is rendered academic.

**B. *Moseley Is Not Entitled To "Automatic Reversal"***

█ In *United States v. Levy*, 25 F.3d 146 (2d Cir.1994), the Second Circuit recently articulated its "most clear and thorough pronouncement on the issue of a trial court's duty to inquire into conflicts of interest," *Ciak*, 59 F.3d at 303, stating that "[w]hen a possible conflict has been entirely ignored, reversal is automatic." *Levy*, 25 F.3d at 153 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 347, 100 S.Ct. 1708, 1717–18, 64 L.Ed.2d 333 (1980)); *see also United States v. Malpiedi*, 62 F.3d 465, 468 n. 2 (2d Cir.1995). This automatic reversal rule applies, however, only when " 'a trial court fails to conduct an inquiry after either a timely conflict objection or if the court "knows or reasonably should know a particular conflict exists." ' " *Levy*, 25 F.3d at 154 (quoting *United States v. Burney*, 756 F.2d 787, 791 (10th Cir.1985), which in turn cites to *Holloway v. Arkansas*,

435 U.S. 475, 488, 98 S.Ct. 1173, 1180–81, 55 L.Ed.2d 426 (1978), and quotes from *Cuyler*, 446 U.S. at 347, 100 S.Ct. at 1717–18).

█ Moseley claims that Sparrow's statements regarding his prior representation of Genovese—both in open court during the sentencing proceeding and in Justice Shapiro's chambers [10]—and his admission to the jury of his lack of objectivity mandated inquiry by the trial court, and its failure to do so requires automatic reversal. The Court finds troublesome the resolution of whether the trial court had sufficient facts during the pre-sentence phase of the trial to trigger judicial inquiry, for at that time Sparrow had only disclosed his prior representation of Genovese, *see Strouse v. Leonardo*, 928 F.2d 548, 555 (2d Cir.1991) (implying that no duty to inquire arises from mere disclosure of prior representation of murder victim), and not his admission to a lack of objectivity, which occurred only during the sentencing phase and suggests a heightened duty. In any event, respondent argues that even if the disclosure and admission give rise to such a duty under current law, the law applicable at the time Moseley's conviction became final did not require such a result. He further argues that retroactive application of current law would run afoul of the Supreme Court's decision in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). For the reasons that follow, the Court concludes that respondent is correct.[11]

---

10. Sparrow testified at the hearing that he disclosed his representation of Genovese to Justice Shapiro in his chambers prior to trial. (H.Tr. 31–33, 59, 117.)

11. Moseley did not raise his "automatic reversal" rule argument in state court. If he were to now bring a new motion to vacate in state court, the court could—but need not—deny the motion pursuant to N.Y.Crim.Proc.Law § 440.10(3)(c), which grants a court discretion to deny such a motion if "[u]pon a previous motion made pursuant to this section, the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so." Since, as discussed below, the automatic reversal rule did not exist until well after Moseley's trial and appeal, a state court reviewing a new motion to vacate might exercise its discretion to adjudicate the claim on its merits, despite the fact that Moseley had previously moved to vacate. Therefore, the claim is arguably unexhausted and, consequently, the entire petition is subject to dis-

missal pursuant to *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982), which held "that a district court must dismiss *habeas* petitions containing both unexhausted and exhausted claims." The Court does not dismiss Moseley's petition on this basis, however. As the *Levy* court explained, whether the automatic reversal rule constitutes an independent claim in-and-of itself or is in support of a broader claim of ineffective assistance remains an open question:

There are two related, though perhaps distinct, grounds for concluding that such an error [to conduct an inquiry] requires reversal. The district court's failure could itself be considered an independent constitutional violation that alone necessitates reversal. Alternatively, the absence of an inquiry by the district court, and thus the absence of any account or record of the true nature of the alleged conflict, may require a presumption of prejudice that a defendant must usually demonstrate to make out a claim of ineffective assistance of counsel.

### 1. The "New Rule" Doctrine

■ In *Teague*, "a plurality of the Court held that, as a general matter, a 'new constitutional rule[ ]' cannot be applied retroactively to cases on collateral review." *Ciak*, 59 F.3d at 302 (quoting *Teague*, 489 U.S. at 310, 109 S.Ct. at 1075). While the Court declined to "define the spectrum of what may or may not constitute a new rule for retroactivity purposes," it noted that "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070. In other words, as the *Teague* Court explained, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* (emphasis in original). Subsequently, a majority of the Court adopted *Teague*'s analysis. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Wright v. West*, 505 U.S. 277, 289–91, 112 S.Ct. 2482, 2489, 120 L.Ed.2d 225 (1992) ("In *Penry*, . . . a majority of this Court endorsed the retroactivity analysis advanced . . . for a plurality in *Teague*").

In post-*Teague* decisions, the Court further defined the "new rule" doctrine. It cautioned that courts undertaking a "new rule" analysis should not deem conclusive a decision's pronouncement that the result was controlled or governed by precedent because "[c]ourts frequently view their decisions as being 'controlled' or 'governed' by prior opinions even when aware of reasonable contrary conclusions reached by other courts." *Butler v. McKellar*, 494 U.S. 407, 415, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). Thus, the Court held "that a rule is 'new' for *Teague* purposes whenever its validity under existing precedents is subject to debate among 'reasonable minds' or among 'reasonable jurists.'" *Wright v. West*, 505 U.S. 277, 291, 112 S.Ct. 2482, 2490, 120 L.Ed.2d 225 (1992) (citing *Butler*, 494 U.S. at 415, 110 S.Ct. at

1217–18; *Sawyer v. Smith*, 497 U.S. 227, 234, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990)). Consequently, when a court applies a prior decision "in a novel setting, thereby extending the precedent," a new rule has been created. *Stringer v. Black*, 503 U.S. 222, 228, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992).

Only a few months ago, in *Ciak*, the Second Circuit took the opportunity to examine the origins of the automatic reversal rule articulated in *Levy*. The court held that, although *Levy* provided a detailed discussion of the rule, its origins for the proposition that automatic reversal must occur where a trial court fails to inquire regarding a potential conflict of which "it was aware or should have been aware" derives from the Supreme Court's decision in *Cuyler*, issued in 1980. *Ciak*, 59 F.3d at 303. Indeed, the *Ciak* court noted that *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), made this quite clear by stating that "[*Cuyler* ] *mandates* a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'" *Wood*, 450 U.S. at 272 n. 18, 101 S.Ct. at 1104 n. 18 (emphasis in original; quoting *Cuyler*, 446 U.S. at 347, 100 S.Ct. at 1717–18); *Ciak*, 59 F.3d at 303.

Moseley, through appointed counsel, concedes the point, stating: "The [automatic reversal] rule was first clearly enunciated in *Wood*, and originated in *Cuyler*." Petitioner's Supplemental Memorandum of Law at 4 (Aug. 14, 1995) (full citations omitted). Despite this concession, Moseley argues that "[t]he rule . . . has origins that pre-date its crystal clear enunciation by the Supreme Court," citing *Olshen v. McMann*, 378 F.2d 993 (2d Cir.), *cert. denied*, 389 U.S. 874, 88 S.Ct. 165, 19 L.Ed.2d 157 (1967), and *Lollar v. United States*, 376 F.2d 243 (D.C.Cir.1967). *Id.* These cases, however, do not support Moseley's position.[12]

*Levy*, 25 F.3d at 153 n. 7 (citations omitted). As a result of the unresolved nature of whether the automatic reversal rule constitutes a claim independent of an ineffective assistance of counsel claim, and because Moseley's automatic reversal argument lacks merit, the Court declines to dismiss Moseley's petition on *Rose v. Lundy* grounds.

12. These cases involved possible conflicts of interests arising from counsel's joint representation of multiple defendants. Nevertheless, the standards articulated in and derived from these cases (and others of their type) have been uniformly applied without distinction to cases involving potential conflicts arising under different circumstances. *See, e.g., Wood*, 450 U.S. at 267–68, 101

In *Olshen,* the Second Circuit made no mention of a trial court's duty to conduct an inquiry in the absence of a party's objection and, of consequence, is devoid of reference to an automatic reversal for its failure to do so. The *Olshen* court merely stated that "[a]lthough some judicial initiative is *probably advisable* when the possibility of a prejudicial conflict is apparent ..., none is required where, as here, the record is barren of both prejudice and any possible conflict[; thus,] the failure of the New York trial court to inquire into the possibility of a conflict of interest does not entitle appellant to have his state conviction set aside." 378 F.2d at 994 (emphasis added). Likewise, although the court in *Lollar* expressed concern for the failure of the trial court to conduct an inquiry regarding the defense counsel's joint representation of co-defendants, the court did not automatically reverse the conviction; rather, it required a showing that the appellant suffered prejudice from the joint representation, a position dissented to by one judge who, instead, advocated automatic reversal. 376 F.2d at 245–48. Surely, these decisions do not establish that the automatic reversal rule had origins that pre-date the rule's enunciation in *Wood* and *Cuyler* such that they "dictated" the rule's creation. *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070.

Moreover, an examination of other decisions issued prior to *Wood* and *Cuyler* reveal sharp disagreement among the circuits regarding the existence and scope, if any, of a duty to inquire. *Cuyler* itself noted this disagreement by explaining that "[a]lthough some Circuits have said explicitly that the Sixth Amendment does not require an inquiry into the possibility of conflicts, ... a recent opinion of the Second Circuit held otherwise." *Cuyler,* 446 U.S. at 346 n. 10, 100 S.Ct. at 1717 n. 10 (citing *Colon v. Fogg,* 603 F.2d 403, 407 (2d Cir.1979), which, although

requiring a duty to inquire, held that failure to do so did not mandate automatic reversal). Likewise, in *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), the Court commented that "courts have differed with respect to the scope and nature of the affirmative duty of the trial judge to assure that criminal defendants are not deprived of their right to the effective assistance of counsel by [their attorneys'] conflicting interests." *Id.* at 483, 98 S.Ct. at 1178. *See also United States v. Mavrick,* 601 F.2d 921, 929 (7th Cir.1979); *United States v. Lawriw,* 568 F.2d 98, 102 (8th Cir.1977), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 60 (1978), *reh'g denied,* 436 U.S. 951, 98 S.Ct. 2860, 56 L.Ed.2d 794 (1978).

Indeed, from 1966 through 1979, at least five circuits had, at one time or another, issued decisions supporting the propositions that either a trial court had no affirmative duty to inquire into possible conflicts absent an objection or, if the trial court had such a duty, the failure to do so did not mandate automatic reversal. *See, e.g., Mavrick,* 601 F.2d at 930 n. 10 ("This circuit has declined to adopt an automatic rule imposing such a duty [of inquiry] on trial judges." * * * "We reject th[e] suggestion" that "the Supreme Court in *Holloway* prohibited any examination by this court of the effect that the [potential conflict] had on [a defendant's] rights during trial and requires that we presume prejudice"); *United States v. Steele,* 576 F.2d 111 (6th Cir.) ("[Defendants] argue that we should adopt a *per se* rule under the Sixth Amendment requiring District Judges to conduct a conflict of interest hearing in all ... cases [involving multiple representation]. We decline to adopt such a rule...."), *cert. denied,* 439 U.S. 928, 99 S.Ct. 313, 58 L.Ed.2d 321 (1978); *Lawriw,* 568 F.2d at 103 ("The decisions of the Eighth Circuit to date (1) do not impose an automatic duty of inqui-

S.Ct. at 1101–02 (possible conflict arising from lawyer's representation of defendants while being paid by defendants' employer, which may have had divergent interests); *Ciak,* 59 F.3d at 298 (possible conflict arising from counsel's prior or representation of important government witness); *Strouse,* 928 F.2d at 552 (possible conflict arising from counsel's prior representation of murder victim). As the *Levy* court· explained:

Some [courts] have questioned whether the Supreme Court's conflicts-of-interest doctrine, much of which developed in the context of joint-representation conflicts, is applicable in all conflicts contexts. This Circuit, however, has not questioned the universal applicability of the Supreme Court's conflicts precepts and has consistently applied the same basic doctrine in all conflict-of-interest situations.

25 F.3d at 153 n. 5 (citations omitted).

ry upon the district court, (2) reject a *per se* rule of conflict, requiring that at least the substantial likelihood of prejudice be shown.....”); *Fryar v. United States,* 404 F.2d 1071 (10th Cir.1968) (noting the difference of opinion over the duty to inquire but declining to reverse without evidence of prejudice to a defendant), *cert. denied,* 395 U.S. 964, 89 S.Ct. 2109, 2110, 23 L.Ed.2d 175, 751 (1969); *United States v. Paz–Sierra,* 367 F.2d 930, 932 (2d Cir.1966) (declining to reverse for failure to inquire and commenting on the lack of wisdom of a rule requiring such an inquiry), *cert. denied,* 386 U.S. 935, 87 S.Ct. 962, 17 L.Ed.2d 807 (1967).[13]

Thus, there exists little doubt that the precedents leading to the creation of the automatic reversal rule in *Cuyler,* as interpreted by *Wood,* were “subject to debate among ‘reasonable minds’ [and] among ‘reasonable jurists,’ ” *Wright,* 505 U.S. at 291, 112 S.Ct. at 2490, as to whether they imposed upon trial courts the duty to inquire into possible conflicts in the absence of objection and, if so, whether the failure to do so constituted automatic reversal. This debate was resolved only with *Cuyler* and *Wood,* indicating that those decisions created the rule in question.

Moseley’s reliance on *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), as the genesis of the automatic reversal rule does not alter this conclusion. *Glasser,* a multiple representation case, involved a defendant who had specifically requested counsel separate from his co-defendant, and his attorney had disclosed potential inconsistencies in the joint defense to the trial court. Thus, *Glasser* merely falls into the category of cases in which a specific objection by defense counsel or defendant may require a trial court’s inquiry. Indeed, *Cuyler* itself noted that the issue of “whether a state trial judge must inquire into the propriety of multiple representations even though no party lodges an objection” was unresolved, a question it answered in the affirmative. 446 U.S. at 345, 100 S.Ct. at

1716–17. *Glasser* thus neither created nor dictated the creation of the automatic reversal rule.

■ For all of these reasons, the Court holds that *Cuyler,* as interpreted by *Wood,* “extend[ed] precedent,” *Stringer,* 503 U.S. at 228, 112 S.Ct. at 1135, by “breaking new ground [and] imposing a new obligation on the States [and] the Federal Government,” *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070, thereby creating the “new rule” of automatic reversal. This rule, established years after Moseley’s conviction on June 11, 1964 and the affirmance (with sentence modification) on June 1, 1967, “was not dictated by precedent existing at the time [his] conviction became final.” *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070.

### 2. *Exceptions To The “New Rule” Doctrine*

■ There exists, however, “two narrow exceptions” to the non-retroactivity principle formulated in *Teague. Caspari v. Bohlen,* — U.S. —, —, 114 S.Ct. 948, 956, 127 L.Ed.2d 236 (1994); *Teague,* 489 U.S. at 311–12, 109 S.Ct. at 1075–76. “The first exception permits the retroactive application of a new rule if the rule places a class of private conduct beyond the power of the State to proscribe ... or addresses a substantive categorical guarante[e] accorded by the Constitution, such as a rule prohibiting a certain category of punishment for a class of defendants because of their status or offense.” *Graham v. Collins,* 506 U.S. 461, 477, 113 S.Ct. 892, 903, 122 L.Ed.2d 260 (1993) (quoting *Saffle v. Parks,* 494 U.S. 484, 494, 110 S.Ct. 1257, 1263, 108 L.Ed.2d 415 (1990); internal quotations omitted), *reh’g denied,* 507 U.S. 968, 113 S.Ct. 1406, 122 L.Ed.2d 778 (1993). Here, as in *Graham* and *Saffle,* “this exception has no application ... because the [automatic reversal] rule [Moseley] seeks ‘would neither decriminalize a class of conduct nor prohibit the imposition of capital punishment on a particular class of

**13.** Even courts that ruled that trial judges had a duty of inquiry into possible conflicts either did not require *per se* reversal for the failure to conduct such inquiry or did so purely through their supervisory power over district courts, not as a dictate of the Sixth Amendment which would bind state courts. *See, e.g., United States v. Waldman,* 579 F.2d 649, 651–52 (1st Cir.1978); *Ford v. United States,* 379 F.2d 123, 125–26 (D.C.Cir.1967).

persons.' " *Id.* (quoting *Saffle,* 494 U.S. at 495, 110 S.Ct. at 1263–64).

■ "The second exception permits federal courts on collateral review to announce ' "watershed rules of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding.' " *Id.* (quoting *Saffle,* 494 U.S. at 495, 110 S.Ct. at 1264, which in turn quotes *Teague,* 489 U.S. at 311, 109 S.Ct. at 1076). As *Graham* states, "[w]hatever the precise scope of this exception, it is clearly meant to apply only to a small core of rules requiring 'observance of those procedures that are implicit in the concept of ordered liberty.' " *Id.* (quoting *Teague,* 489 U.S. at 311, 109 S.Ct. at 1076; internal quotations omitted). In other words, the exception applies only to those "bedrock procedural elements" which are "central to an accurate determination of guilt or innocence." *Teague,* 489 U.S. at 311, 313, 109 S.Ct. at 1075–77.

■ Invocation of this exception "must be consistent with the recognition that '[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system.' " *Sawyer v. Smith,* 497 U.S. 227, 242, 110 S.Ct. 2822, 2831, 111 L.Ed.2d 193 (1990) (quoting *Teague,* 489 U.S. at 309, 109 S.Ct. at 1074). Thus, the " 'costs imposed upon the State[s] by retroactive application of new rules of constitutional law on *habeas corpus* . . . generally far outweigh the benefits of this application.' " *Id.* (quoting *Solem v. Stumes,* 465 U.S. 638, 654, 104 S.Ct. 1338, 1347–48, 79 L.Ed.2d 579 (1984)). Therefore, the exception is further limited only "to those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Teague,* 489 U.S. at 313, 109 S.Ct. at 1077.

■ In light of these principles, the Court concludes that the second exception is inapplicable to permit retroactive application of the automatic reversal rule. First, despite the pronouncements of *Cuyler* and *Wood,* the rule was only recently applied in the Second Circuit—*compare United States v. Edwardo-Franco,* 885 F.2d 1002, 1007 (2d Cir.1989)

(applying different rule in 1989), *with Strouse,* 928 F.2d at 555 (recognizing viability of automatic reversal rule in 1991)—suggesting that the rule is not one of the "bedrock procedural elements" of our system of jurisprudence. *Cf. Cain v. Redman,* 947 F.2d 817, 820–22 (6th Cir.1991) (holding that rule invalidating jury instructions as Constitutionally infirm because they diluted presumption of innocence and affected allocation of burdens of proof was "not within the narrow category of fundamental bedrock procedural elements that come within the exception"), *cert. denied,* 503 U.S. 922, 112 S.Ct. 1299, 117 L.Ed.2d 521 (1992); *Williams v. Chrans,* 945 F.2d 926 (7th Cir.1991) (rule of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), prohibiting race-based jury selection, "does not appear . . . to alter an understanding of a 'bedrock procedural element' "), *cert. denied,* 505 U.S. 1208, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992).

Second, a number of circuits in post-*Cuyler* and *Wood* decisions have explicitly declined to apply the rule. *See United States v. Winkle,* 722 F.2d 605, 611–12 (10th Cir. 1983) ("While the record thus left this serious question [of waiver of a possible conflict] open without a discussion by the court with the defendant, and without a clear determination on the conflict of interests question, we cannot agree that reversal and a new trial are now mandated"); *Brien v. United States,* 695 F.2d 10, 15 n. 10 (1st Cir.1982) (holding that while "[s]ome courts, looking to *Wood*'s language stating that a reversal is 'mandated' when the required inquiry is not conducted[,] have assumed that the trial court's failure to inquire about potential conflicts in and of itself requires reversal of the conviction," this result is not warranted here) (citations omitted); *United States v. Knight,* 680 F.2d 470, 470 (6th Cir.1982) (stating that sufficient conflict existed to require inquiry, but rather than automatically reversing for trial court's failure to do so, ordering remand), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 723, 74 L.Ed.2d 950 (1983); *Hamilton v. Ford,* 969 F.2d 1006, 1011–12 (11th Cir.1992) (holding that automatic reversal occurs only where trial court fails to conduct an inquiry when faced with a timely objection to a possible conflict), *cert. denied,*

507 U.S. 1000, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993); *see also United States v. Marrera,* 768 F.2d 201, 205 (7th Cir.1985), *cert. denied,* 475 U.S. 1020, 106 S.Ct. 1209, 89 L.Ed.2d 321 (1986). This continuing disagreement is additional evidence that the rule does not fall within the exception's "small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty." *Graham,* 506 U.S. at 478, 113 S.Ct. at 903 (internal quotation marks omitted).

Third, since the automatic reversal rule overturns otherwise perfectly valid determinations of guilt without the need to demonstrate an adverse affect of any possible conflict on counsel's performance or dereliction in the adjudicatory process, in many cases the rule does not "seriously" increase the likelihood of accurate convictions. *Teague,* 489 U.S. at 313, 109 S.Ct. at 1076–77. Indeed, as discussed more fully below, even after full hearing there exists no evidence in the record that Sparrow's performance was defective as a result of the purported conflict of interest. *See infra* Part II.C. In light of the truly overwhelming proof of Moseley's guilt, the application of the rule here to reverse his conviction would not serve to advance significantly the accuracy of that determination.

█ Fourth, the mere fact that the rule touches on a defendant's right to representation at trial does not require the conclusion that it falls within the exception, for if this fact alone sufficed, then many rules or proposed rules would avoid the dictates of *Teague.* Unlike other rules pertaining to the Sixth Amendment which seek to ensure competent performance of counsel and prejudice-free outcomes, *see, e.g., Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the automatic reversal rule is "prophylactic" in nature, *Brien,* 695 F.2d at 15 n. 10, requiring reversal regardless of counsel's performance. Therefore, blind application of the exception to rules pertaining to ineffective representation would fail to distinguish between "bedrock" rules and other rules, thereby greatly expanding the limited nature of the exception. Moreover, different rules touching upon equally fundamental concepts do not automatically

fall within the exception. *See, e.g., Skelton v. Whitley,* 950 F.2d 1037 (5th Cir.) (finding no retroactive application of rule striking Constitutionally infirm "reasonable doubt" jury instruction because it did not implicate a "bedrock procedural element"), *cert. denied,* 506 U.S. 833, 113 S.Ct. 102, 121 L.Ed.2d 61 (1992); *Cain,* 947 F.2d at 820–22 (concluding that rule prohibiting use of jury instruction which diluted presumption of innocence and affected allocation of burdens of proof should not be given retroactive application).

Finally, retroactive application of the automatic reversal rule would undoubtedly affect a great number of otherwise final convictions because of trial courts' reliance on then-prevailing caselaw that no duty existed to inquire into possible conflicts absent objection. Hence, reversal of decades-old murder and other convictions for prisoners serving life sentences, for example, would occur with little chance of retrial. As Justice Harlan stated in *Mackey v. United States,* 401 U.S. 667, 91 S.Ct. 1171, 28 L.Ed.2d 388 (1971), a decision relied upon heavily by the *Teague* Court:

> No one, not criminal defendants, not the judicial system, not society as a whole is benefitted by a judgment providing that a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation.

*Id.* at 691, 91 S.Ct. at 1179. Because the rule Moseley seeks to apply retroactively overturns convictions on the mere possibility of a conflict of interest without a demonstration of adverse performance, the societal costs inherent in such application, not only in terms of time and expense but also in the public's diminished faith in a criminal justice system seemingly incapable of determining with finality a defendant's guilt, " 'far outweigh the benefits of ... application.' " *Sawyer,* 497 U.S. at 242, 110 S.Ct. at 2831 (quoting *Solem,* 465 U.S. at 654, 104 S.Ct. at 1347–48).

The invocation of an exception to the *Teague* doctrine is not here appropriate. Therefore, even if Justice Shapiro should have engaged in a conflict inquiry, the automatic

reversal rule would not have retroactive application.

### C. The Merits

 Having determined that there exists no procedural bar to the Court's consideration of Moseley's claim on its merits, and that he is not entitled to "automatic reversal," the Court now undertakes a merit-based analysis. In so doing, the Court is mindful of the Second Circuit's explication that "[t]he right to counsel under the Sixth Amendment entails 'a correlative right to representation that is free from conflicts of interest.'" *Levy*, 25 F.3d at 152 (quoting *Wood*, 450 U.S. at 271, 101 S.Ct. at 1103). Such a right is violated when a defendant's "attorney has (1) a potential conflict of interest that result[s] in prejudice to the defendant, or (2) an actual conflict of interest that adversely affect[s] the attorney's performance." *Id.* (citations omitted). An attorney operates under a potential conflict of interest if his own interests *"may* diverge at some point [with his client's] so as to place the attorney under inconsistent duties," *Cuyler*, 446 U.S. at 356 n. 3, 100 S.Ct. at 1714 n. 3 (Marshall, J., concurring and dissenting in part) (emphasis added), whereas "[a]n attorney labors under an actual . . . conflict 'when, during the course of the representation, the attorney's and defendant's interests [do] "diverge with respect to a material factual or legal issue or to a course of action." '" *United States v. Lussier*, 64 F.3d 34, 40–41 (2d Cir.1995) (quoting *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994), which in turn quotes *Cuyler*, 446 U.S. at 356 n. 3, 100 S.Ct. at 1714 n. 3). The Court concludes that Sparrow labored under neither a potential conflict which prejudiced Moseley nor an actual conflict which adversely affected his performance.

### 1. Sparrow Did Not Labor Under A Potential Conflict Which Prejudiced Moseley

In *Cuyler*, the Supreme Court foreclosed ineffective assistance of counsel claims under the "potential conflict" prong from defendants who fail to object to possible conflicts during trial, stating that "a defendant who raise[s] no objection at trial [to a possible conflict] must demonstrate that an *actual* conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348, 100 S.Ct. at 1718 (emphasis added). Courts have applied this foreclosure rule to bar consideration of potential conflict claims arising from, *inter alia*, an attorney's alleged friendship with a testifying drug enforcement officer, *Simon v. United States*, 1992 WL 245985 at *7 (Sept. 14, 1992) (Sifton, J.), and an attorney's alleged divided loyalties between his current and former clients. *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir.1988).

 Application of this bar to a defendant who failed to object to his attorney's possible conflict raises questions closely resembling those addressed by the Second Circuit in *Billy–Eko, see supra* Part II.A.1, where the court noted the unfairness in requiring a defendant to raise his trial counsel's ineffectiveness when that same counsel represented him on appeal. Even if this bar were not to apply to Moseley (who offered no objection to Sparrow at trial and, indeed, continued to retain him for his post-verdict motion and appeal), Moseley could still not establish ineffective assistance under the potential conflict prong. Assuming that Sparrow's prior representation of Genovese created a possible conflict, Moseley suffered no consequent prejudice. In order to establish prejudice resulting from a potential conflict, a *habeas corpus* petitioner must demonstrate that there exists a "reasonable probability that but for counsel's [possible conflict], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *see also United States v. Fulton*, 5 F.3d 605, 609 (2d Cir.1993). Moseley's counsel concedes that this burden has not been met, arguing instead that Moseley's claim rests exclusively on the automatic reversal rule:

> Nobody ever said it was a big conflict. I never thought at the hearing that your Honor scheduled and allowed us to hold that Mr. Sparrow was about to testify that he was so related to [K]atherine Genovese that he threw the defense nor would I

think I would be able to demonstrate at this hearing or 100 other hearings if your Honor would extend that to us, that there was any genuine prejudice....

Our argument is different. It's a simple constitutional point. A lawyer at trial says that he has a conflict of interest and that it affected his performance and the judge did nothing about it. In 1980 and 1981 and in a bevy of cases right up until a few weeks ago coming out of this circuit, the *Ciak* case, ... it has been the rule that when that happens the defendant is entitled to an automatic reversal....

(H.Tr. 166–67.) As discussed above, however, Moseley's automatic reversal rule argument lacks merit, and, in light of the above concession, so does any argument that Moseley suffered prejudice as a result of Sparrow's presumed potential conflict of interest. Even without this concession, however, prejudice could not be demonstrated, for as discussed below, despite his apparent statements to the contrary, Sparrow gave Moseley effective, competent and capable counsel under difficult circumstances.

### 2. *Sparrow Did Not Labor Under An Actual Conflict Which Adversely Affected His Performance*

#### a. *No Actual Conflict Of Interest Existed*

In *Strouse*, the Second Circuit addressed the question of whether a *habeas corpus* petitioner's trial counsel labored under an actual conflict of interest due to the counsel's prior representation of a murder victim. Indeed, the victim in that case was the petitioner's own mother and his lawyer's prior representation of the mother consisted of not one matter handled years earlier, but three separate, unrelated matters—including drafting the mother's will—over the course of a number of years. Despite the obvious intimate ties between the mother and lawyer, the court held that no actual conflict of interest existed, stating conclusively: "We can dis-

cern no way in which this prior work for [the mother] created a conflict in [the lawyer's] representation of [the petitioner] at his murder trial." *Strouse*, 928 F.2d at 553.[14]

■ Similarly, in *Crisp v. Duckworth*, 743 F.2d 580 (7th Cir.1984), *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985), the Seventh Circuit faced the same question with the same result:

[The lawyer] never actively represented conflicting interests. He represented [the murder victim] in a completely unrelated action with which [the petitioner] had no connection. Moreover, he informed [the petitioner] of this and [the petitioner] agreed that the former representation of [the murder victim] created no problem. There is no showing that [the lawyer] developed any sort of relationship with [the murder victim] as a result of this previous representation.

*Id.* at 588. *See also Kirkpatrick v. Butler*, 870 F.2d 276, 284 (5th Cir.1989) (finding no conflict where defense counsel had friendship with and had in the past represented members of murder victim's family), *cert. denied*, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990). Even where the lawyer does not inform his client of his prior representation of the murder victim, *habeas corpus* relief will not be granted in the absence of demonstrable proof of an actual conflict of interest. *See, e.g., Dixson v. Quarles*, 781 F.2d 534, 535 (6th Cir.1985) (holding that "appellant was unable to demonstrate any actual conflict of interest or actual prejudice to her defense in the criminal proceeding" even though her trial lawyer had failed to disclose his prior representation of the murder victim), *cert. denied*, 479 U.S. 935, 107 S.Ct. 411, 93 L.Ed.2d 362 (1986).

■ These cases demonstrate that Sparrow did not labor under an actual conflict of interest as a result of his prior representation of Genovese. This representation consisted of a minor gambling offense unrelated

---

**14.** The lawyer in *Strouse* also labored under another possible conflict arising out of the fact that he was named as the alternate executor under the mother's will, to take effect in the event that the primary executor—the petitioner—predeceased the mother. 928 F.2d at 552. Regarding this possible conflict, the court remanded for the purpose of conducting a hearing to "develop the circumstances surrounding [the lawyer's] application for appointment as executor" and take "evidence on [the lawyer's] fee arrangement with [the petitioner]." *Id.* at 554–55. There exists no reported decision regarding the outcome of this hearing.

to her murder (H.Tr. 13–15)—an offense which constituted but one of thousands of such cases handled by Sparrow during the early 1960s. (H.Tr. 111). He met Genovese for the first time in the hallway of the courthouse on the day of her trial—a trial lasting only five minutes (H.Tr. 15)—and subsequently spoke with her on no more than two occasions. (H.Tr. 27.) After the appeal, which comprised argument of pure legal issues not requiring communication with Genovese (H.Tr. 24), Sparrow had no further contact with her. (H.Tr. 28.) Thus, the uncontroverted evidence regarding Sparrow's representation of Genovese establishes only the barest of contact between lawyer and client.

Moreover, unlike cases where the victim testifies for the prosecution and the defendant's counsel is conflicted by the obligation to maintain attorney-client confidences and the need to cross-examine effectively, here the victim was dead, thereby negating even the possibility of any such conflict. *Cf. Castillo v. Estelle,* 504 F.2d 1243, 1245 (5th Cir.1974) (concluding that where victim is also principal witness for prosecution, "counsel is placed in the equivocal position of having to cross-examine his own client as an adverse witness. His zeal in defense of his client the accused is thus counterpoised against solicitude for his client the witness"). Furthermore, because of Genovese's death, there could be no lawyer-client conflict with respect to any future business. *Cf. United States v. Jeffers,* 520 F.2d 1256 (7th Cir.), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1975). Finally, since Sparrow did not represent either Genovese's estate or her family, there existed no other pecuniary interest which may have adversely influenced his defense of Moseley.

Thus, the only road left to explore is whether Sparrow's purported emotional ties to Genovese constituted an actual conflict of interest. *See* Affidavit Of Winston Moseley In Reply To Opposition To Vacate Judgement at 3 (Apr. 18, 1989) (alleging that Sparrow "was not capable of putting forth a defense for defendant because of emotional and personal ties with the victim"). Indeed, Sparrow's own statement during the sentencing phase of the trial that he "didn't try this case ... objectively, calmly, just as a lawyer defending a client [should]" reeks of an actual conflict of interest. Despite this statement, however, the Court is mindful of the Second Circuit's admonition in *Strouse* that "it is not enough in determining the existence of an actual conflict of interest merely to assess the attorney's state of mind"; rather, there must exist some "objective basis for the claim." 928 F.2d at 553. Here, the objective basis is lacking.

Sparrow's ephemeral representation of Genovese did not create the type of relationship likely to bias him towards his former client over his current client any more than any lawyer would feel compassion and sympathy towards a savagely murdered victim. Indeed, Sparrow's own testimony at the hearing buttresses this conclusion:

> She [Genovese] was nothing to me any more than 10,000 cases of that type that she was in, had come to my attention in those years, but for the fact it was a similar name, it could just as easily been I went into Genovese Drugstore and therefore have a conflict of interest.

(H.Tr. 111.) Sparrow also indicated his belief that he zealously advocated for Moseley, despite his sympathy for Genovese:

> [SPARROW:] I did represent Mr. Moseley to the best of my ability, for anything that may intimate anywhere that that is not the case would be erroneous. I gave him my best.
>
> [MOSELEY'S LAWYER:] Despite any animosity you might have felt?
>
> [SPARROW:] I felt no animosity. I detested some of the things that I learned he had done. I felt badly for the victims. By taking on the burden of representing him, trying to save him from the electric chair[,] didn't mean that I would become less than a human being aware of what he had done with his deprivations of womenkind.

(H.Tr. 57.)

Sparrow's statement during the sentencing phase, when read in context with the statements that followed, reveals a strategy designed to elicit from the jury the sense that all people, including himself, recoil and cringe at listening to and envisioning the brutality thrust upon Genovese—all people, he argued, except Moseley: "You saw the complete, flat, unemotional, non-remorseful

uncompassionate responses [of Moseley on the stand]." Record at 485. Thus, he continued, "in deciding whether or not to send him to jail for life, or to the electric chair, you have a right to try to figure out what made his mind go in the fashion that it did. . . . You must . . . decide now, was his knowledge, his [mental] ability such that he is so chargeable with it that you feel he must die." *Id.* These are not the arguments of a person laboring under an actual conflict of interest; rather, they are the arguments of an attorney effectively advocating for his client, "just as a lawyer defending a client [should]"—despite Sparrow's statement to the contrary.[15]

■ The evidence establishes that Sparrow not only informed the trial court of his representation of Genovese prior to the sentencing phase of the trial (H.Tr. 31–33, 59, 117), but also that he informed Moseley. (H.Tr. 72–74, 117.) While Moseley testified to the contrary at the hearing (H.Tr. 124, 139), the Court finds this portion of Moseley's testimony incredible, particularly because, in moving to vacate his conviction in state court, Moseley "allege[d] that at the time of trial, he was never aware that his attorney had previously represented Katherine Genovese," Thomas Decision at 1—an allegation which was simply untrue. (*See* H.Tr. 138–39.) [16] Finally, although Sparrow should have explained to Moseley any potential risks flowing from such prior representa-

tion, which he did not do (H.Tr. 72, 117), in light of the complete absence of evidence demonstrating that Moseley's and Sparrow's respective interests "diverge[d] with respect to a material factual or legal issue or to a course of action," *Lussier,* 64 F.3d at 40–41 (citations omitted), this Court concludes that Sparrow did not labor under an actual conflict of interest.

### b. Even If An Actual Conflict Existed, It Did Not Adversely Affect Sparrow's Performance

■ Even assuming, *arguendo,* that an actual conflict of interest existed, Moseley still is not entitled to *habeas corpus* relief because there exists no evidence that the conflict "adversely affected [Sparrow's] performance." *Levy,* 25 F.3d at 152.[17] In order to succeed on this point, Moseley is obligated to establish a "lapse in representation," *Cuyler,* 446 U.S. at 349, 100 S.Ct. at 1719; *Malpiedi,* 62 F.3d at 469, such that there existed "some plausible alternative defense strategy or tactic [that] might have been pursued" but was not because it "inherently . . . conflict[ed] with . . . the attorney's other loyalties or interests." *Levy,* 25 F.3d at 157 (citations and internal quotation marks omitted). Here, Sparrow had no viable alternative but to defend Moseley in the manner in which he did.

■ By the time Sparrow began his representation of Moseley on March 25, 1964,

---

**15.** During the hearing, Sparrow explained his strategy and what he meant when he said that he did not try the case objectively:

> [MOSELEY'S LAWYER:] What did you mean when you say you didn't "try the case objectively"?
> [SPARROW:] I wasn't dealing with pawns. I was dealing with a human being who had done certain things that other human beings detested. I, as an attorney, was not necessarily [obligated] to love and care for my client. It was my obligation as a mechanic in the law to give him the best that I could because that's what the law said he was entitled to. So, although, I was not subjective so as to impede my capacity to help him, I was also not objective and forgetting [about] the things he had done. . . . What I was intending to do . . . was to show that everybody in that room, in that courtroom, felt the horror of the situation. Only one person did not react. That person . . . was Winston Moseley. . . . I was showing to the jury that this man was, in fact, unaware

that he had done something that under the law was wrong. He knew the nature and quality of his act. He didn't know it was wrong. (H.Tr. 51–52.)

**16.** Other facts also cast in doubt Moseley's credibility. For example, on cross-examination of Moseley, it became apparent that he had lied during parole board hearings. (H.Tr. 149–50.)

**17.** In limited circumstances, the Second Circuit applies a *per se* rule relieving a defendant of the obligation to establish that his attorney's conflicts had an adverse effect on the attorney's performance. *See, e.g., Levy,* 25 F.3d at 157 n. 8; *Strouse,* 928 F.2d at 555; *Bellamy v. Cogdell,* 974 F.2d 302, 306–07 (2d Cir.1992) (*in banc*), *cert. denied,* 507 U.S. 960, 113 S.Ct. 1383, 122 L.Ed.2d 759 (1993). This *per se* rule only applies, however, where a defendant's attorney was unlicensed or had engaged in the defendant's crimes. *See Levy,* 25 F.3d at 157 n. 8; *Winkler,* 7 F.3d at 308; *Bellamy,* 974 F.2d at 306–07.

Moseley had already confessed to killing Genovese and two other women, raping a fourth woman and attempting to rape another. (H.Tr. 43, 48, 69, 84.) Whether Moseley spoke the truth with respect to this confession is not seriously in doubt; he independently corroborated numerous events about which the police had knowledge and told them exhaustive details of his crimes about which they were unaware, such as where to find Genovese's wallet, the hunting knife used to kill her and the manner in which another victim—Annie Mae Johnson—was slain.[18] (H.Tr. 77, 80–82.) Indeed, Moseley himself confirmed the veracity of his confession in private conversations with Sparrow, causing Sparrow contemporaneously to write: "He may be crazy, but he sure is truthful." (H.Tr. 79.) Given these facts, Sparrow could not ethically put Moseley on the stand to deny that he killed Genovese; in any event, "[t]here was no way [that such a defense] could fly." (H.Tr. 84.) Therefore, Sparrow and his co-counsel "unanimously decided ... that [an insanity defense] would be the road we were going to travel." (H.Tr. 98.) Sparrow explained that this was Moseley's only realistic option: "I had a professional decision to make at the time, based on my knowledge, my years, my experiences. There was only one way that I could possibly consider saving this man's life" (H.Tr. 95)—the insanity defense.

Moseley offers no alternative strategy which Sparrow should have pursued in lieu of the insanity defense. His present counsel, however, intimated at the hearing that Sparrow should have moved to suppress the confession, for a change in venue or for an adjournment. A pretrial motion to suppress the confession was not a practical option in light of then-existing caselaw and the facts surrounding the confession. At the time of

Moseley's trial, many landmark decisions affecting (and extending) defendants' rights in this area were not yet decided. For example, the Supreme Court had not yet issued its opinions in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); or *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and the New York Court of Appeals had not yet decided *People v. Huntley*, 15 N.Y.2d 72, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965)—all of which afforded defendants considerable protection against involuntary confessions. Without these cases, Sparrow would have had to argue the involuntariness of Moseley's confession to the *jury*, which would have been instructed to disregard its contents if it believed the confession was coerced. Sparrow rightly concluded that there existed no way the jury could have put out of its collective mind the contents of the mutilations detailed in the confession, even if successful in arguing that Moseley gave it involuntarily.[19]

Moreover, the facts do not support the conclusion that Moseley gave the confession involuntarily. At trial, when expressly asked by the court whether "[a]nybody threaten[ed] you" during the interrogation, Moseley responded that "persuasive is more the word I would use." Record at 248. In addition, Moseley had no physical injuries at the time of and immediately following his interrogation and there exists no medical records detailing treatment for any injuries. (H.Tr. 93.) Moseley's testimony at the hearing that he was "[s]truck in the face but not hard enough to leave a mark" and "struck in the stomach and chest but nowhere where a mark would show" (H.Tr. 131), as well as his other claims of coercion, are not credible. In light of the nature of the confession, wherein Moseley corrects misinformation held by the

---

**18.** Moseley confessed that he had murdered Ms. Johnson by shooting her, whereas the coroner's report listed the cause of death as stab wounds. As a result of this discrepancy, both Sparrow and Phil Chetta, Esq. (formerly a Queens County Assistant District Attorney) flew to North Carolina to have the body exhumed. Re-examination confirmed that Ms. Johnson had been shot six times. (H.Tr. 80–82.)

**19.** Notably, within a week of the Supreme Court's issuance of the decisions in *Escobedo* and *Jackson*, which were rendered on June 22, 1964, only days after Moseley's conviction, Sparrow moved to vacate the conviction, including in his papers the argument that Moseley was entitled to be warned of his right to have counsel present (H.Tr. 89–90)—a right which was not sanctioned by the Supreme Court until *Miranda*, nearly two years later. This post-verdict motion was denied.

police, it is entirely reasonable for Sparrow to have concluded that "[a] reading of the statement ... would create in any decent criminal lawyer's mind the awareness that this was something that was not being extracted piece by piece by coercion." (H.Tr. 93.)

Likewise, a motion for a change in venue would not likely have served a useful purpose. As Sparrow acknowledged during his testimony: "People in every county in this country knew about this case" (H.Tr. 67), and there existed no better venue than in "the most cosmopolitan center in the United States, the City of New York," in which to have it tried, particularly because of the "unfortunate racial aspects of this case of a black man killing and sexually mutilating a white woman." (H.Tr. 68.) The same holds true for a motion for an adjournment. There was no realistic chance that the publicity surrounding this case would have subsided in a few weeks or even years. Indeed, the public's interest in this murder remains high today.

Even assuming, *arguendo,* that these motions were plausible and likely to succeed, there is simply no evidence that they were "inherently in conflict with or not undertaken due to [Sparrow's purported] other loyalties or interests." *Levy,* 25 F.3d at 157. To the contrary, the evidence establishes that Sparrow presented more than a mere competent defense. He obtained the services of two pre-eminent psychiatrists (both heads of major hospital units) to attest to Moseley's condition of insanity, extracted painstakingly the bizarre details of Moseley's behavior and life, attacked vigorously the prosecution's psychiatrist and, ultimately, obtained reversal of Moseley's death sentence.

## III.

### *CONCLUSION*

For all of the above reasons, Moseley's petition for a writ of *habeas corpus* is **DENIED.**

**SO ORDERED.**