**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STEPHEN EDWARD MAY,
*Petitioner-Appellee/
Cross-Appellant*,

v.

DAVID SHINN, Director; MARK
BRNOVICH, Attorney General,
*Respondents-Appellants/
Cross-Appellees.*

Nos. 17-15603
17-15704

D.C. No.
2:14-cv-00409-
NVW

ORDER

Filed June 10, 2022

Before: Sandra S. Ikuta and Michelle T. Friedland, Circuit
Judges, and Frederic Block,[*] District Judge.

Order;
Concurrence by Judge Block

---

[*] The Honorable Frederic Block, Senior United States District Judge
for the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Habeas Corpus / Mandates

Denying Stephen Edward May's motion to recall a mandate, the panel wrote (1) motions that assert a judgment is void because of a jurisdictional defect generally must show that the court lacked even an arguable basis for jurisdiction, (2) May has not met that standard in arguing that the statutory "in-custody" requirement was satisfied, and (3) the additional details provided in the motion and accompanying exhibits do not demonstrate this Court's holding on mootness lacked an arguable basis.

Constrained by his oath of office to concur in his colleagues' decision rejecting May's last effort to escape lifetime incarceration, District Judge Block wrote separately to reinforce Judge Friedland's conclusion that "this case, an in particular May's sentence, reflects poorly on our legal system," *May v. Shinn*, 954 F.3d 1194, 1209 (9th Cir. 2020), *cert. denied* 141 S. Ct. 1740 (2021), and that justice compels that May's sentence be commuted by the State of Arizona.

## COUNSEL

Robert A. Walsh (argued), Assistant Attorney General, Criminal Appeals Section; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Respondents-Appellants/Cross-Appellees.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Erica T. Dubno (argued), Fahringer & Dubno Herald Price Fahringer PLLC, New York, New York; Robert J. McWhirter, Law Offices of Robert J. McWhirter, Phoenix, Arizona; Michael D. Kimerer, Kimerer & Derrick P.C., Phoenix, Arizona; for Petitioner-Appellee/Cross-Appellant.

Mikel Patrick Steinfeld, Phoenix, Arizona, for Amicus Curiae Arizona Attorneys for Criminal Justice.

J. Thomas Sullivan, Little Rock, Arkansas, for Amicus Curiae National Association for Rational Sex Offense Laws.

## ORDER

May's motion to recall the mandate (Dkt. No. 135) is **DENIED**. "[M]otions that assert a judgment is void because of a jurisdictional defect generally" must show that "the court that rendered judgment lacked even an 'arguable basis' for jurisdiction." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010) (citations omitted). May has not met that standard in arguing that the statutory "in-custody" requirement was unsatisfied. *Maleng v. Cook*, 490 U.S. 488, 490–91 (1989) (per curiam); *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968). Nor do the additional details provided in the motion and accompanying exhibits demonstrate that this Court's holding on mootness lacked an arguable basis. *Kernan v. Cuero*, 138 S. Ct. 4, 7 (2017) (per curiam).

BLOCK, Senior District Judge, concurring:

This is another failed attempt by the defendant Stephen May to avoid spending the rest of his life in prison. Although I am constrained by my oath of office to concur in my colleagues' decision rejecting May's latest effort to escape lifetime incarceration, I write separately to reinforce Judge Friedland's conclusion that "this case, and in particular May's sentence, reflects poorly on our legal system," *May v. Shinn*, 954 F.3d 1194, 1209 (9th Cir. 2020), *cert. denied* 141 S.Ct. 1740 (2021), and that justice compels that May's sentence be commuted by the State of Arizona.

# I

As shown by the past decisions of this panel, this is a bizarre case. May stands convicted by an Arizona jury of five of eight counts of child molestation of three children between the ages of six and eight. He was acquitted on two counts with respect to a nine-year-old child. *See May v. Ryan*, CIV 14-0409-PHX-NVW (MHB), 2015 WL 13188352, at *13 (D. Ariz. Sept. 15, 2015).[1]

The convictions occurred after the trial judge had declared a mistrial when the jury had announced that it could not reach a verdict. Although the judge had discharged the jury, the judge allowed the jury to recommence its deliberations after the bailiff—as the lawyers were preparing to leave the courtroom—had advised the judge that the jurors wished to continue deliberating, and defense counsel consented. May's conviction was rendered following a weekend break after several more hours of deliberations. At

---

[1] For reasons unrelated to the merits, the final count was dismissed at the behest of the victim's parents. *Id.* at *14.

the age of 37, May was sentenced to 75 years of incarceration without parole. Unless he lives to be 112, he will die in jail.

May had served ten years of his term of imprisonment as the case wended its way through the state and federal judicial systems before the district court granted his habeas petition and released him from incarceration. *See May v. Ryan*, 245 F. Supp. 3d 1145 (D. Ariz. 2017). In a lengthy opinion Judge Wake ruled that May's trial counsel rendered ineffective assistance under *Strickland v. Washington,* 466 U.S. 668 (1984), because he did not object to the constitutionality of the Arizona law placing the burden of proving lack of intent on the defendant. *May*, 245 F. Supp. 3d at 1166.

On appeal, we unanimously disagreed, explaining:

> Given the long-standing status of the law in Arizona that the State is not required to prove sexual intent to successfully prosecute a defendant for child molestation, which provided the background for the "prevailing professional practice at the time of trial," we cannot conclude that trial counsel's failure to object to the constitutionality of the statute placing the burden of proving lack of intent on the defendant fell "below an objective standard of reasonableness."

*May v. Ryan*, 766 F. App'x 505, 507 (9th Cir. 2019) (internal citations omitted).[2]

Nevertheless, Judge Friedland and I affirmed the district court's grant of habeas on other grounds: We first noted that "the State's case turned entirely on the jury's believing the testimony of several child victims who all had struggled to provide details of the alleged molestation on the stand, including failing to remember whether some of the incidents even took place." *Id.* at 507. We concluded that, in light of the particular circumstances, "when the trial judge asked if either party objected to the jury resuming deliberations after the court had already declared a mistrial and discharged the jury, competent counsel would have objected." *Id* at 508. Consequently, we ruled that "[t]he decision not to object was completely unsupportable on this record and, therefore, under the circumstances, could not have been considered a sound trial strategy." *Id.* (citations and internal quotation marks omitted). We also held that the prejudice prong of *Strickland* was satisfied.[3]

---

[2] Although we could not agree with Judge Wake that trial counsel was remiss in failing to object to the statute's constitutionality, Judge Wake's opinion makes a compelling case that the statute is indeed unconstitutional. Notably, the Supreme Court has yet to rule on the issue. In May's petition for certiorari, the issue of the statute's constitutionality was not presented. Three Questions Presented were advanced, each dealing with the application of *Strickland*. Petition for Certiorari at 2, *May v. Shinn*, 141 S.Ct. 1740 (2021) (No. 20-1080).

[3] Judge Ikuta dissented. She believed that the majority's decision was based on "pure speculation" about "how a second trial would unfold," but that "pure speculation was insufficient to establish deficient performance" and that "we should reject such uninformed prognostications." *May*, 766 Fed. App'x at 509.

However, Judge Friedland changed her vote in response to the State's petition for rehearing, which pointed out that the panel had misunderstood an aspect of the case's procedural history. Writing for what was now a majority of the panel, she reasoned that since the State's case was so weak, "it was reasonable [for trial counsel] to think that the jury might acquit May if it continued deliberating." *May*, 954 F.3d at 1204. Accordingly, trial counsel could not be faulted for consenting to further deliberations. She explained that the alleged sexual molestation charges were predicated upon the brief touching of the children's genitals by May on the outside of either their clothing or bathing suits, and nothing more. *Id.* at 1197. As she elaborated:

> The fact that the jury was deadlocked meant that at least one juror wanted to acquit May. And both parties agree that the State's evidence against May was far from overwhelming. All four children testified that other people were nearby when May touched their genital areas. Luis and Danielle testified that May touched them when more than twenty people, including other adults, were in the vicinity—but none of those people claimed to see anything. Luis was also unable to identify May in court. Taylor and Danielle testified that they were unable to remember an incident in which May had touched them that they had previously disclosed to police. And Sheldon testified that he thought that May's touching was accidental until Taylor's mother told him otherwise. The State had not offered any expert testimony to try to explain away these discrepancies in the children's accounts. Based on these and other

weaknesses in the State's case, it was reasonable to think that the jury might acquit May if it continued deliberating. Indeed, the jury ultimately did acquit May on the counts related to Sheldon.

*Id.* at 1204.  I dissented, concluding that "[b]ecause I would find that May's counsel was objectively deficient in not objecting to resumed jury deliberations, and because there was a reasonable probability that an objection would have been sustained, I would affirm the grant of *habeas* relief." *May*, 954 F.3d at 1221.

In a brief concurring opinion, Judge Ikuta reasoned:

It is our duty to impartially follow and apply the law.  Here, as required to "reflect our enduring respect for the State's interest in the finality of convictions that have survived direct review withing the state court system," we adhered to the limited scope of federal habeas review. In doing so, we uphold the fundamental principles of our legal system.

*Id.* at 1208 (internal citations omitted).  In a separate concurring opinion, Judge Friedland wrote "to express [her] dismay at the outcome of this case:"

While I certainly recognize the seriousness of child molestation, the evidence that May was actually guilty of the five counts of molestation he was convicted on was very thin.  May's conviction on those counts was based almost entirely on the testimony of the children who were the alleged victims.  Yet, as described in the opinion, that testimony

had many holes. The potential that May was wrongly convicted is especially concerning because he was sentenced to seventy-five years in prison—a term that all but ensures he will be incarcerated for the rest of his life.

Given the significant constraints on the scope of our review, we are not in a position to do more than decide the narrow question whether the proceedings in this case were so egregiously unfair that they violated the Constitution. *But I agree with the dissent that this case, and in particular May's sentence, reflects poorly on our legal system.*

*Id.* at 1208–09 (emphasis added). After having been at liberty for more than four years May returned to prison.

## II

I have profound respect for my two judicial colleagues who denied May's habeas petition. Judge Ikuta certainly cannot be faulted for her commitment "to follow and apply the law." *Id.* at 1208. But, as Judge Friedland poignantly comments, we have reached a point in our judicial decision-making that "reflects poorly on our legal system." *Id.* at 1209.

Judge Friedland's clarion call about the current status of our legal system triggered my thoughts about a period of time over a half-century ago when the Supreme Court had issued a spate of ground-breaking decisions that spoke well of our judicial system. There was *Brown v. Board of Education* in 1954, *Mapp v. Ohio* in 1961, *Baker v. Carr* in 1962, *Gideon v. Wainright* in 1963, *Jackson v. Denno* in

1964, and *Miranda v. Arizona* in 1966. And I thought about the *Clayton* case.

In 1968 I was a young solo practitioner in Suffolk County, New York, when the New York State Court of Appeals assigned me to represent Robert Clayton. It was just a few years after the Supreme Court had held in *Jackson v. Denno* that those who had been convicted based on a confession had the right to a hearing to determine if it was voluntary.

Clayton had been indicted and convicted for murder as a result of a fight he had with a fellow migrant farm worker. Pursuant to *People v. Huntley*—the New York equivalent to *Jackson*—the trial court held a hearing to determine whether his confession was voluntary. *People v. Clayton*, 342 N.Y.S.2d 106, 108 (1973). I was assigned to handle this appeal. Ultimately, Clayton's conviction was ruled to be the product of "a pattern of police dominance and coercion." *Mancusi v. United States ex rel. Clayton*, 454 F.2d 454, 456 (2d Cir. 1972).

Clayton had spent about 20 years in jail when I gave him the good news: Rather than retry him, the Suffolk County District Attorney had agreed to allow him to plead to involuntary manslaughter. With credit for time served, Clayton would be a free man.

To my surprise, he rejected the offer. He told me that he had adjusted to a life in prison and wasn't sure he could adjust to a life out of prison as a convicted felon. I didn't know what to do, but the trial court, on its own motion, dismissed the indictment *in the interests of justice* pursuant to N.Y. Crim. Proc. Law § 210.40. *See People v. Clayton*, 350 N.Y.S.2d 495, 495 (Co. Ct. 1973). That statute re-codified an obscure provision of the Code of Criminal

Procedure, dating back to 1881: "The court may, either of its own motion, or upon the application of the district attorney, and in furtherance of justice, order an action, after indictment, to be dismissed." *People v. Campbell*, 48 Misc. 2d 798, 799 (N.Y. Misc. 1966) (citing Sec. 671 of the Code of Criminal Procedure); *see also* Practice Commentaries, N.Y. Crim. Proc. Law § 210.40.

The government appealed, arguing before the intermediate appellate court that never in the annals of the law had a murder indictment been dismissed on the court's own motion, and in the absence of the District Attorney's consent, in the so-called interests of justice.

In a precedent-making decision, Judge Hopkins, writing for a unanimous court, (1) affirmed the power of a court to dismiss *any* indictment, upon its own initiative, in the interests of justice; (b) established the substantive standards to be henceforth employed in evaluating when principles of justice required dismissal, and (c) asserted that a hearing must be held to determine if dismissal was warranted. *See Clayton*, 342 N.Y.S.2d at 109–111. The court specified seven considerations that must be considered at such a hearing: "(a) the nature of the crime; (b) the available evidence of guilt; (c) the prior record of the defendant; (d) the punishment already suffered by the defendant; (e) the purpose and effect of further punishment; (f) any prejudice resulting to the defendant by the passage of time, and (g) the impact on the public interest of a dismissal of the indictment." *Id.* at 110. As the court wrote, the dismissal of an indictment "depended only on principles of justice, not on the legal or factual merits of the charge or even on the guilt or innocence of the defendant." *Id.* at 109.

On remand, I conducted the first "interest of justice" hearing in the state's history. The trial court granted the

motion, and Clayton's murder indictment was dismissed. Thus, was born the *Clayton* hearing, which exists to this date.

Almost a half-century ago, I wrote an article for the New York State Bar Journal recounting my Clayton journey. *See* Frederic Block, *The Clayton Hearing*, N.Y. State B.J., Oct. 1973, 409.  I was struck by the notion that because of New York's embrace of interest of justice hearings, "our legal system, though predicated upon the fundamental concept of due process, recognizes that the law must be possessed of an even more pervasive spirit; one that transcends common, codified or even constitutional law." *Id.* at 411.  I commented that "it is, after all, the principle of 'justice' which is the hallmark of our jurisprudence, and that the letter of the law is not the final word." *Id.*  I concluded by stating that dismissal in the interests of justice may be appropriate— even for a murder indictment, such as in *Clayton*—"for reasons transcending the defendant's guilt or innocence." *Id.* at 412.

Although *Clayton* hearings abound to this day in New York State, there is no federal counterpart. The concept of justice tempering the strictures of the law is anathema to the federal justice system. Accordingly, as Judge Friedland laments, "*this case, and in particular May's sentence, reflects poorly on our legal system.*"

## III

There are two relevant injustices that have impacted May's lifetime sentence: (1) the strictures of habeas relief; (2) the emotional overlay that contributes to irrational

sentencing when the nature of the crime entails sexual misconduct involving children.[4]

It is my hope that by calling attention to these injustices this opinion will be of considerable value to those who will undoubtedly one day be deciding whether May's sentence should be commuted. I believe it is the responsibility of judges who have had the opportunity to identify injustices in the sentencing of a defendant to play an active role in sharing that information with those who will be passing final judgment on the life of a human being. I believe, therefore, that "there is no reason why judges could not play a more regular role in clemency." Jessica A. Roth, *The "New" District Court Activism in Criminal Justice Reform*, 72 N.Y.U. Ann. Surv. Am. L. 187, 382 (2018). This is in keeping with the moral responsibility of judges, who are "uniquely positioned to bring perceived injustices to other's attention and must." Jessica A. Roth, *Jack Weinstein:*

---

[4] These are not the only injustices that reflect "poorly on our legal system:" We are the world leader in "mass incarceration." With a prison population of more than 2.3 million, we incarcerate our populace at more than twice the rate of Russia, four times that of China, and more than fourteen times that of Japan. *See* James Kilgore, *Understanding Mass Incarceration: A People's Guide to the Key Civil Rights Struggle of Our Time* 11 (The New Press 2015). Congress—the first branch of government—has usurped much of the power of the judiciary by imposing mandatory minimums in over 25% of the sentences that judges must mete out, threatening to reduce the third branch of government to a twig. Our Sentencing Guidelines are often irrational and of little value. *See, e.g.*, *United States v, Parris,* 573 F.Supp.2d 744 (2008) (White Collar Crimes); *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) (Child Pornography). And we make it difficult for ex-felons to re-enter society by imposing an inordinate number of restrictions as "collateral consequences." *See United States v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. 2016).

*Reimagining the Role of the District Court Judge,* Federal Sentencing Reporter, Vol. 33, No. 3 163, 165 (Feb. 2021).

## A.  The Strictures of Habeas Relief

My first exposure to the writ of habeas corpus as a district judge was in 1995 during my first year on the bench. Winston Moseley, who had been convicted of killing Kitty Genovese in 1964, sought the writ decades after his conviction. The murder had caught national attention since it was one of the most infamous and brutal murders committed during that century and "symbolized urban apathy [since] 38 people heard her screams but did nothing." 214 N.Y.L.J. 29 (July 25, 1995).

My initial reaction was that the inordinate passage of time had to preclude my asserting jurisdiction over the case. But to my surprise I learned that there was no statute of limitations for habeas petitions. I therefore conducted a hearing because Moseley's trial lawyer had testified in state court that he had previously represented Genovese and consequently "didn't try this case . . . objectively, calmly, just as a lawyer defending a client [should]." *Moseley v. Scully*, 908 F. Supp. 1120, 1125 (E.D.N.Y. 1995). This disclosure and admission compelled me to conduct the hearing to inquire into the nature, duration, breadth and bounds of this prior representation for the purpose of determining whether Genovese's lawyer labored under a constitutionally impermissible conflict of interest that adversely affected his representation. I denied Moseley's habeas petition on the merits, but only after determining that neither the passage of time nor other procedural grounds barred Moseley's claim.

A year after my decision, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA").

It created a one-year statute of limitations and "departed from earlier efforts to reform the federal postconviction process by implementing strict new procedural and substantive barriers to successful federal habeas corpus relief." David Goodwin, *An Appealing Choice: An Analysis of and a Proposal for Certificates Of Appealability in "Procedural" Habeas Appeals,* 68 N.Y.U. Ann. Surv. Am. L. 791, 792 (2013). Under AEDPA a federal court "shall not" grant habeas relief "unless" the state court's decision was (1) "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the decisions of the Supreme Court, or (2) based on an "unreasonable determination of the facts in light of the evidence presented" in the original proceeding. 28 U.S.C. § 2254(d)(1); (2).

The Supreme Court's recent decision in *Brown v. Davenport*, No. 20-826, 2022 WL 1177498 (Apr. 21, 2022), traces how AEDPA "represented a sea change in federal habeas law." *Id.* at *8. As Justice Gorsuch framed the issue:

> After a state court determines that an error at trial did not prejudice a criminal defendant, may a federal court grant habeas relief based solely on its independent assessment of the error's prejudicial effect under *Brecht v. Abrahamson*, 507 U.S. 619 (1993)? Or must a federal court also evaluate the state court's decision under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)?

*Id.* at *3.

Justice Gorsuch traced the reach of habeas relief during the country's history. He explained how by 1953 federal

habeas practice had taken on a permissive scope. In that year the Supreme Court held that a state-court judgment was "'not *res judicata*' in federal habeas proceedings with respect to a petitioner's federal constitutional claims." *Id.* at \*7 (citing *Brown v. Allen*, 344 U.S. 443, 458 (1953)). Thus, "[f]ull-blown constitutional error correction became the order of the day." *Id.* Eventually, the Supreme Court "responded to the post-*Brown* [*v. Allen*] habeas boom by devising new rules aimed at separating the meritorious needles from the growing haystack." *Id.* at \*8.

For example, in *Chapman v. California*, 386 U.S. 18 (1967), the Court had held that "when a defendant demonstrates on direct appeal that a constitutional error occurred at his trial, his conviction cannot stand unless the government proves the error's harmlessness 'beyond a reasonable doubt.'" *Brown v. Davenport*, 2022 WL 1177498, at \*8 (quoting *Chapman*, 386 U.S. at 24). But in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), it "resolved that this same standard was inappropriate for use in federal habeas review of final state-court judgments." *Brown v. Davenport*, 2022 WL 1177498, at \*8 (citing *Brecht*, 507 U.S. at 633–34). "Instead, the Court reasoned, a state prisoner should not receive federal 'habeas relief based on trial error unless' he can show the error had a 'substantial and injurious effect or influence' on the verdict." *Id.* (quoting *Brecht*, 507 U.S. at 637). In so doing, "the Court stressed that undoing a final state-court judgment is an 'extraordinary remedy,' reserved for only 'extreme malfunctions in the state criminal justice system' and different in kind from providing relief on direct appeal." *Id.* (quoting *Brecht*, 507 U.S. at 633–34).

Not satisfied with *Brecht's* restrictions, Congress doubled down by enacting its AEDPA "sea change,"

imposing new "demanding" obstacles in the path of habeas petitions. *Id.* Consequently, the majority held in *Brown v. Davenport* that in order to qualify for habeas relief, a petitioner must satisfy both *Brecht* and AEDPA. It reasoned that "where AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Brown v. Davenport*, 2022 WL 1177498, at *9.

An empirical study conducted ten years after AEDPA disclosed that it had effectively neutered habeas relief. As it reported, compared to a 40% success rate prior to AEDPA, by 2007 out of a sample of 2,384 cases that year, only 7 writs were granted by the federal courts in non-capital cases. Z. Payvand Ahdout, *Direct Collateral Review*, 121 Colum. L. Rev. 159, 174 (2021). Thus, the practical effect of AEDPA was "to halt the prior federal practice of employing habeas review to bring new conditions of fairness to the steamroller systems of justice found in too many states." Jed S. Rakoff, *The Magna Carta Betrayed?*, 94 N.C. L. Rev. 1423, 1429 (2016).

Now, with the Supreme Court's decision in *Brown v. Davenport*, superimposed on the difficulties in surmounting the strictures imposed under *Strickland* when seeking relief for ineffective counsel—as reflected by this case—habeas relief today is virtually a dead letter. *Brown v. Davenport*, therefore, realistically put the final nail in the habeas coffin.[5] *See also Shinn v. Martinez Ramirez*, No. 20-1009, slip op. at

---

[5] Indeed, Arizona's habeas regime includes many of the same procedural and substantive roadblocks found in the federal system. *See* Keith J. Hilzendeger, *Arizona State Post-Conviction Relief*, 7 Ariz. Summit L. Rev. 585 (2014).

15–17 (U.S. May 23, 2022) (imposing further procedural requirements on federal habeas ineffective assistance of counsel claims).

## B. Irrational Sentencing of Sexual Misconduct Crimes Involving Children

Nothing provokes more emotionality than sex crimes perpetrated on a child. The public widely regards child sex offenders as the "worst of the worst" and "better off dead." Colleen M. Berryessa & Chaz Lively, *When A Sex Offender Wins the Lottery: Social and Legal Punitiveness Toward Sex Offenders in an Instance of Perceived Injustice*, 25 Psychol. Pub. Pol'y & L. 181 (2019).

Congress has responded to this emotional outrage. For example, it has created Sentencing Guidelines for child pornographers that place all of them—be they mere possessors or inveterate distributors—at "a typical total offense level of 35." *United States v. Dorvee*, 616 F.3d 174, 186 (2d Cir. 2010). As explained in *Dorvee*, "[a]n ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months." *Id.*

I cite *Dorvee* because it is an extraordinary circuit-court case that exemplifies how raw emotions can trigger irrational sentences when children are the victims of sexual misconduct. *See also United States v. Henderson*, 649 F.3d 955, 965–69 (9th Cir. 2011) (Berzon, J., concurring) (citing *Dorvee*, 616 F.3d at 186–88). Foremost, are the irrational Guidelines that Congress has created for convicted child pornographers. Thus, as *Dorvee* points out: "[T]he Guidelines actually punish some forms of direct sexual contact with minors more *leniently* than possession or distribution of child pornography." *Id.* at 184.

The current status of the child pornography Guidelines dates to Congress' enactment of the PROTECT Act of 2003, Pub. L. 108-21, 117 Stat. 650.  It was the culmination of the Sentencing Commission's multiple amendments to these Guidelines—at Congress' direction—since their introduction in 1987, each time calling for harsher penalties. *Dorvee*, 616 F.3d at 184.  And "it was the first instance since the inception of the Guidelines where Congress directly amended the *Guidelines Manual*."  *Id.*

But, as explained in *Dorvee*, these congressionally mandated Guidelines were "fundamentally different from most" and "unless applied with great care, c[ould] lead to unreasonable sentences."  *Id.*  The circuit court quoted from the comments by a former United States Attorney for the Eastern District of New York that the changes effected by the PROTECT Act evinced a "blatant disregard for the Commission" and were "the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress."  *Id.* at 185 (internal quotation marks omitted).  As he explained, Congress:

> (i) adopted sentencing reforms without consulting the Commission, (ii) ignored the statutorily-prescribed process for creating guideline amendments, (iii) amended the Guidelines directly through legislation, (iv) required that sentencing data be furnished directly to Congress rather than to the Commission, (v) directed the Commission to reduce the frequency of downward departures regardless of the Commission's view of the necessity of such a measure, and (vi) prohibited the

Commission from promulgating any new downward departure guidelines for the next two years.

*Id.* (citation omitted).

The upshot of all of this congressional frenzy was that "sentencing enhancements cobbled together through this process routinely result[ed] in Guidelines projections near or exceeding the statutory maximums, even in run-of-the-mill cases." *Id.* at 186. Thus, Dorvee's sentencing range was calculated by the district court to be 262 to 327 months for having sexually explicit conversations with an undercover agent posing as a 14-year-old-boy, sending sexually explicit videos and images via the internet to the agent, and meeting another undercover agent, also posing as a 14-year-old boy, with a camera that he intended to use to photograph the "[the boy's] feet and penis." *Id.* at 176.

*Dorvee* illustrates the irrationality of the child pornography Guidelines with two examples: (1) "An adult who intentionally seeks out and contacts a twelve-year-old on the internet, convinces the child to meet and to cross state lines for the meeting, and then engages in repeated sex with the child, would qualify for a total offense level of 34, resulting in a Guidelines range of 151 to 188, with a criminal history category of 1." *Id.* at 187. Dorvee, meanwhile, had the same criminal history category and had "never had any contact with an actual minor," yet "was sentenced by the district court to 233 months of incarceration," based, ironically, in part on the district judge's fear "that Dorvee *would* sexually assault a child in the future." *Id.* (2) A defendant convicted of possessing on his computer two nonviolent videos of seventeen-year-olds engaging in consensual conduct, with no criminal history, would result

in a Guidelines range of 46 to 57 months. "This," the court noted, "is the same Guidelines sentence as that for an individual with prior criminal convictions placing him in a criminal history category of II, who has been convicted of an aggravated assault with a firearm that resulted in bodily injury." *Id.*

Thus, although the circuit court recognized that "enforcing federal prohibitions on child pornography is of the utmost importance," it held that "it would be manifestly unjust to let Dorvee's sentence stand." *Id.* at 188. Therefore, it remanded the case for resentencing, cautioning the district court that it was "dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id.*

The public's hatred of child pornographers is part of its emotional reaction to all sexual crimes involving children. Indeed, "[i]ndividuals living with pedophilic disorder are the most universally despised group in modern society." Margo Kaplan, *Taking Pedophilia Seriously* 72 Wash. & Lee L. Rev. 75, 128 (2015). Judges are not exempt from such emotional reactions. If anyone sexually assaulted one of my two adorable little grandchildren, I would probably be indicted for murder. But I understand as a rational jurist that I cannot let my judgments be based on my emotions.

Realistically, the public's fear of pedophiles running loose and abusing children should be tempered by the knowledge that we judges impose enormous constraints on their freedom even when they are not incarcerated. The PROTECT Act authorizes life supervision by the Probation Department and, in some cases, requires it. The Adam Walsh Act requires those convicted of specified sex crimes to register as sex offenders and sets up a national database to coordinate state sex-offender registries.

Moreover, stringent special conditions are routinely imposed during supervised release. My list is fairly typical and includes mental health treatment, limitations on contact with children, limitations on computer access, and submission to random searches and other monitoring to ensure compliance.

Consequently, the data suggest that the recidivist rates for child sex offenders are low. For example, compared to a 67.8% re-offense rate for state prisoners in general over a three-year period ending in 2018, there was only a 3.5% re-offense rate for child sex offenders during that same time period. Maureen F. Larson & Robert F. Schopp, *Sexual Predator Laws: Clarifying the Relationship Between Mental Health Laws and Due Process Protections*, 97 Neb. L. Rev. 1167, 1169 (2019).

I have discussed the Second Circuit's decision in *Dorvee* at length because it is a clear exposition of how Congress has responded to the public's emotional pedophilia hysteria by creating irrational child pornography Guidelines—which still exist. But this hysteria has obviously impacted the harsh sentences that the states have created for crimes entailing the sexual molestation of children, such as reflected in this case. Incredibly, May faces the rest of his life in prison for briefly fondling three children over their outer garments in broad public. Moreover, Judge Friedland correctly explains that the evidence against May "was very thin," and "had many holes." Thus, as she acknowledges, there was "[t]he potential that May was wrongly convicted." *May v. Shinn*, 954 F.3d 1194, 1208 (9th Cir. 2020).

But such are the harsh realities of life where thousands of innocent people are incarcerated and many are even on death row. Jay Robert Nash, *"I am Innocent!": A Comprehensive Encyclopedic History of the World's*

*Wrongly Convicted Persons* (2008); Daniel H. Benson, *Executing the Innocent*, 3 Ala. C.R. & C.L.L. Rev. 1 (2013); *see also* Frederic Block, *Prosecutors aren't above the law: Gov. Cuomo must sign legislation creating an oversight commission*, The Daily News (Jul. 30, 2018).[6] Nonetheless, I doubt that even the most hardened believers that child molesters should be severely punished would objectively conclude that sentencing May to life was rational, and would agree with me and Judge Friedland that it "reflects poorly on our legal system."

## IV

May has now apparently run the gamut of any judicial recourse that might have been available. The only chance he has of not being incarcerated for the rest of his life would seem to be executive commutation. The Arizona Board of Executive Clemency ("Clemency Board"), comprising five members appointed by the Governor, may recommend the commutation of a sentence to the Governor "after finding by clear and convincing evidence that the sentence imposed is clearly excessive given the nature of the offense and the record of the offender and that there is a substantial probability that when released the offender will conform the offender's conduct to the requirements of the law." Ariz. Rev. Stat. § 31-402.

Statistics provided by the Clemency Board show that between 2004 and 2016, it heard an annual average of 594.9 clemency hearings and recommended a yearly average of

---

[6] Available at: https://www.nydailynews.com/opinion/ny-oped-prosecutors-arent-above-the-law-20180726-story.html.

only 48.2 prisoners to the Governor who, in turn, granted an average of only 6.7 per year.

Given the nature of his offense, it is unlikely that the Clemency Board would recommend that the Governor commute May's sentence.  But he would seem to be a perfect candidate for commutation.  He had already served a decade of his sentence before being released by Judge Wake, and the record before me reflects that he was a law-abiding citizen during his more than four years of freedom before being returned to prison: He never attempted to abscond even though he knew that if Judge Wake's decision were reversed he would be spending the rest of his life in jail, and he faithfully complied with his terms of supervised release.

Hopefully the Clemency Board will recognize the unusual nature of this case and recommend that the Governor commute May's sentence. And hopefully the Governor will agree that to do so in this particular case would be the humane thing to do *in the interests of justice*.